STATE OF CONNECTICUT *v.* RONNIE HINTON
(14313)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

Argued June 2—decision released August 24, 1993

James J. Ruane, special public defender, with whom was Michael A. Fitzpatrick, special public defender, for the appellant (defendant).

Timothy J. Sugrue, assistant state's attorney, with whom, on the brief, were John M. Bailey, chief state's attorney, and Rosita M. Creamer, assistant state's attorney, for the appellee (state).

KATZ, J. A jury convicted the defendant, Ronnie Hinton, of three counts of murder in violation of General Statutes § 53a-54a,[1] one count of capital felony in violation of General Statutes § 53a-54b,[2] one count of attempted murder in violation of General Statutes §§ 53a-49 and 53a-54a,[3] and one count of assault in the first degree in violation of General Statutes (Rev. to 1989) § 53a-59.[4] The defendant appeals to this court

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person . . . ."

[2] General Statutes § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of any of the following . . . (8) murder of two or more persons at the same time or in the course of a single transaction."

[3] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." See footnote 1 for the relevant text of General Statutes § 53a-54a.

[4] General Statutes (Rev. to 1989) § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to

pursuant to General Statutes § 51-199[5] from the judgment of the trial court sentencing him to a term of life imprisonment without possibility of release.[6] He claims that the court improperly: (1) instructed the jury concerning the doctrine of transferred intent; (2) accepted inconsistent jury verdicts; and (3) permitted the prosecutor to use peremptory challenges to strike two African-American venirepersons from the jury panel.[7] We agree with the defendant that the trial court improperly accepted inconsistent jury verdicts and

cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; or (2) with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, he causes such injury to such person or to a third person; or (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person."

Subsequent to the defendant's actions in 1989, this statute was amended in ways not relevant to this opinion.

[5] General Statutes § 51-199 provides in relevant part: "(a) The supreme court shall have final and conclusive jurisdiction of all matters brought before it according to law, and may carry into execution all its judgments and decrees and institute rules of practice and procedure as to matters before it.

"(b) The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[6] The trial court sentenced the defendant pursuant to General Statutes § 53a-54b to life imprisonment without possibility of release for the capital felony conviction, twenty years imprisonment for the attempted murder conviction and twenty years imprisonment for the assault conviction. The twenty year terms for assault and attempted murder were to be served consecutively to each other, but concurrently to the sentence of life imprisonment. The three murder convictions were merged with the capital felony conviction for purposes of sentencing. See *State* v. *Wood,* 208 Conn. 125, 145, 545 A.2d 1026, cert. denied, 488 U.S. 895, 109 S. Ct. 235, 102 L. Ed. 2d 225 (1988).

[7] The defendant initially also claimed that the trial court improperly instructed the jury concerning circumstantial evidence and the state's burden of proof. The defendant has withdrawn this claim, however, and we do not consider it.

therefore reverse the convictions for attempted murder and assault in the first degree. We find the defendant's other claims unpersuasive, however, and therefore affirm the capital felony and three murder convictions.

The jury could reasonably have found the following facts. On October 7, 1989, Antoine Smith and Juan Picot were at the home of Kiki, a girl they knew in Hartford. The defendant came by the house, shook his head at Smith and Picot, and left. He then returned with a group of approximately twelve others who were armed with sticks, bats and rocks. A scuffle ensued between the defendant's group and Smith, Picot, Kiki and her family.

On October 13, Sheldon Webb and a group of his friends were in the vicinity of the M & M Diner in Hartford. When the defendant, who was also in the vicinity, saw Webb, he mistook him for someone else, jumped off his bicycle, pulled a sawed-off shotgun from his jacket and pointed it at Webb. When the defendant recognized Webb, he put the gun back in his jacket, and told Webb that he had mistaken him for one of several youths who had "jumped" him a week ago. At this point, Bennie Fulse who was driving past, stopped and spoke with the defendant. The defendant told Fulse he was having a "beef" with a group of youths and asked Fulse if he would allow him to do a drive-by shooting from his car. Fulse declined and drove away.

Webb and his friends walked down the street with the defendant following them. Shortly thereafter, while on Martin Street in Hartford, the Webb group encountered a larger group of ten to fifteen males, including Picot, approaching from the opposite direction. At some point during this encounter, the defendant left the Webb group on the sidewalk and moved into the street. A member of the larger group, a young man nicknamed

"Cat," also went into the street waving either a gun or a stick in the air and said, "Remember this?" to the defendant. The defendant responded, "Remember this," and took a sawed-off shotgun out of his jacket. The defendant fired the shotgun once into the group of males who had accompanied Cat. The defendant then fled to his home.

As a result of the shooting, three of the young men in the Cat group were killed and another was seriously injured. The evidence adduced at trial showed that the shotgun had been loaded with "triple ought" buckshot, the largest commercially manufactured shot. A shell loaded with triple aught buckshot typically contains eight individual pellets. One pellet struck Kevin Carter in the forehead and entered his brain, killing him. Another struck James Parham in the abdomen, then traveled through his body and severed his aorta, causing him to bleed to death. Three pellets fatally struck Picot—one in the forehead, one in the right flank and another in the groin. In addition, Jason Diaz was seriously wounded by a pellet that penetrated his abdomen. He underwent surgery twice and lost segments of both his colon and large intestine as a result of the shooting.

The defendant did not testify at trial. Through other evidence, he presented a theory of self-defense claiming that the ten to fifteen young men accompanying Cat were members of a gang that was "out to get him." The defendant told the police that he had pulled the shotgun out in self-defense and had fired at the feet of the group in order to scare its members. The jury convicted the defendant on all counts.

I

We first consider the defendant's claim that the trial court improperly instructed the jury concerning the

doctrine of transferred intent[8] with regard to the three murder counts. After defining the intent necessary to constitute murder, the trial court instructed the jury that "as long [as] the defendant has an intent to cause the death of someone and by his [action] causes the death of another, it is sufficient" to establish murder.[9]

[8] The notion of disparity between the mental fault and the unintended result (unintended victim, manner, type of harm and degree of harm) has received much attention by legal scholars and appellate courts for over one hundred years and has led to the evolution of the doctrine of transferred intent. W. LaFave & A. Scott, Criminal Law (1972) §§ 34 and 35. This case presents the issue of the unintended victim. Both the defendant and the state agree that the principle of "transferred intent" was created to apply to the situation of an accused who intended to kill a certain person and by mistake killed another. His intent is transposed from the person to whom it was directed to the person actually killed. The doctrine may be illustrated as follows: "A aims his gun at his enemy B with intent to kill B but, missing, hits and kills A's friend C instead. . . . [T]he principle of 'transferred intent' applies, so that, for example, A's intent to kill B is transferred to C, who was actually killed as a result of A's conduct. . . ." 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.5, p. 310. Although this traditional formulation of the doctrine requires that the intent be transferred, such intent is not regarded as a limited commodity that, once satisfied, is totally expended.

[9] The trial court charged the jury as follows: "As to the third element, did he intend to cause the death of another person. 'A person acts intentionally with respect to a result or conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.' That's the statutory definition of intent. As we know, we can't look into the mind of a person to determine what he intends and if we were to determine what he intends we can only do so from the circumstances surrounding his conduct.

"Now, premeditation is not necessary. In making your determination on the question of intent you should keep in mind that an intent to cause death does not have to exist for any specified length of time. On the one hand it may come into existence well in advance of the act causing death or on the other hand it may be formulated in a matter of seconds, just before or at the very moment of the commission of the act causing the death.

"Now, in this connection it's not necessary for the defendant to have caused the death of the person whom he intended to cause—whose death he intended to cause as long as he acted with the intent to cause death to a person and by his act caused death to that person or another person.

"So as an illustration, if a defendant intended to kill his wife, who was taking a certain airplane, and he planted a bomb on that airplane, even

The defendant claims that this instruction was improper because: (1) intent to kill may not be transferred to an unintended victim if the intended victim is also killed; and (2) even if the intended victim is not killed, intent may not be transferred to more than one unintended victim. Under each of these theories, if the defendant intended to kill only one person, then there would be only one murder regardless of how many people were actually killed.[10] The defendant claims that because the court's transferred intent instruction improperly allowed the jury to find him guilty of all three murders even if there had been only one intended victim, all three intentional murder convictions must be reversed.[11] We disagree.

We note as a preliminary matter that the defendant did not object to the transferred intent instruction at trial. He nevertheless maintains that his claim is reviewable as an exceptional circumstance pursuant to *State v. Golding*, 213 Conn. 233, 238–42, 567 A.2d 823 (1989).

---

if his wife did not take the plane the defendant would have intended to cause the death of his wife, which was the essential [intent] element of the crime of murder. And if death of others occurred it would be sufficient as to the [other elements of murder].

"So, in effect, what I've said is that a defendant, as long [as] the defendant has an intent to cause the death of someone and by his [action] causes the death of another, it is sufficient."

[10] For example, if the defendant intended to kill Juan Picot, then Picot's death would constitute murder. The unintended deaths of Kevin Carter and James Parham would not be murder under the defendant's first theory, however, because the death of the intended victim—Picot—would prevent the transference of intent to the deaths of the unintended victims. This is true under the defendant's interpretation, because the death of one intended victim would prevent transference of intent to the deaths of the other unintended victims. Similarly, under the defendant's second theory, if someone other than Picot, Carter or Parham were the intended victim, then the defendant could be convicted of only one count of murder even though all three died.

[11] Even if we agreed with the defendant's arguments, he does not explain why all three of the intentional murder convictions would necessarily be reversed. Because we do not find his arguments persuasive, however, we will not speculate.

Under *Golding,* a defendant may prevail on a claim not preserved at trial only if four conditions are met: "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." Id., 239–40.

The defendant has satisfied the first two prongs of *Golding.* First, the record is adequate to review this claim. Second, "[a]n accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Williams,* 202 Conn. 349, 363, 521 A.2d 150 (1987). Although we generally do not consider a claim regarding the giving of an improper instruction or the failure to give a proper instruction unless the claim is properly preserved at trial; id., 362; "[t]his court has consistently held that a claim that the judge improperly instructed the jury on an element of an offense is appealable even if not raised at trial." Id., 363; see *State* v. *Allen,* 216 Conn. 367, 383, 579 A.2d 1066 (1990) (improper jury instruction on an essential element of the crime violates the defendant's due process rights); *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982) (a claim that implicates the defendant's right to have the jury properly charged on all essential elements of the crime charged is reviewable even if unpreserved). Because the defendant's claim concerns intent, which is an essential element of the crime of murder, he has satisfied *Golding's* second prong. Though the defendant's claim is reviewable, it fails under the third prong of *Golding* because we conclude

that the trial court's instruction was proper.[12] Section 53a-54a (a)[13] provides that "[a] person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person *or of a third person* . . . ." (Emphasis added.) We agree with the state that the statute on its face allows transferred intent for the crime of murder without limitation as to the number of people killed. The clear meaning of the statute leads to the result that, when a person engages in conduct with the intent to kill someone, there can be a separate count of murder for every person actually killed by the conduct.

The defendant argues, however, that the language of the statute, "causes the death of such person or of a third person," supports his position. He claims that because the singular "third person" is used instead of the plural "third persons," the statute does not apply if more than one unintended victim is killed. Under the defendant's interpretation of the statute, there could be only one murder, no matter how many unintended victims were killed. He also claims that because "or" is used, the statute does not apply where the intended victim *and* a third person are killed. Under this interpretation of § 53a-54a, only the death of the intended victim would be murder. We disagree.

Contrary to the defendant's interpretations of the statute, the use of the singular "third person" and the disjunctive "or" warrants that each death be treated as a separate murder under the statute. If the plural "third persons" were used, it would suggest that the deaths of multiple third persons should be treated as a single count of murder. Similarly, if "and/or" were used in place of "or," it would indicate that the deaths of an intended and an unintended victim should be

[12] Any discussion of the fourth prong is therefore unnecessary.
[13] See footnote 1.

treated as a single murder. We conclude, therefore, that the language of the statute contradicts the defendant's position, rather than supports it.

The language of the statute is more plausibly read as consistent with the position of the state and inconsistent with the position of the defendant. Human beings are not fungible. Therefore, a separate injury to each constitutes a separate crime, and the law does not give the defendant a discount on the second and subsequent victims of his intentional conduct. See *State v. Lytell*, 206 Conn. 657, 666, 539 A.2d 133 (1988). Viewed through this prism, it is clear that, as to each person killed, the defendant had the "intent to cause the death of another person," and, acting with that intent, he "cause[d] the death of . . . a third person . . . ." General Statutes § 53a-54a. Thus, although the traditional formulation of the doctrine of transferred intent is usually stated in singular terms; see footnote 8; that does not mean that such intent, once employed, is thereby totally expended.

The defendant urges this court to construe § 53a-54a in accordance with three of our older cases; *State v. Hoyeson*, 154 Conn. 302, 224 A.2d 735 (1966); *State v. Leopold*, 110 Conn. 55, 147 A. 118 (1929); *State v. Costa*, 95 Conn. 140, 110 A. 875 (1920); all of which recognized, in dictum, the doctrine of transferred intent in its traditional form. See footnote 8. There is nothing in these cases, however, that requires us to reduce the defendant's liability for his intentional conduct by, in effect, exacting only one price for the three deaths that he caused.

The defendant's request is unsupported by public policy and contradicts the language of the statute. The trial court's transferred intent instruction was, therefore, consistent with the meaning of the murder statute and the mischief sought to be proscribed.

Finally, the defendant urges this court to follow *People* v. *Birreuta,* 162 Cal. App. 3d 454, 208 Cal. Rptr. 635 (1984), in which the California Appellate Court for the fifth district held that if a defendant kills both an intended and an unintended victim, the doctrine of transferred intent may not be applied to make the unintended killing a murder. Our research reveals that other jurisdictions that have considered this issue, however, have reached the opposite conclusion. See, e.g., *United States* v. *Sampol,* 636 F.2d 621, 674 (D.C. Cir. 1980); *United States* v. *Weddell,* 567 F.2d 767, 769–70 (8th Cir. 1977), cert. denied, 436 U.S. 919, 98 S. Ct. 2267, 56 L. Ed. 2d 761 (1978); *State* v. *Worlock,* 117 N.J. 596, 569 A.2d 1314 (1990). We find these other cases more persuasive. "When a defendant contemplates or designs the death of another, the purpose of deterrence is better served by holding that defendant responsible for the knowing or purposeful murder of the unintended as well as the intended victim. Hence, we reject defendant's argument that the successful killing of the intended victim prevents the 'transfer' of that intent to an unintended victim." *State* v. *Worlock,* supra, 617.

## II

We next consider the defendant's claim that the trial court improperly accepted inconsistent jury verdicts on the counts of attempted murder of Diaz and assault in the first degree of Diaz. We agree with the defendant on this claim, and therefore reverse these two convictions and remand the case for a new trial on those counts.

The jury found the defendant guilty of both the attempted murder of Diaz pursuant to §§ 53a-49 and 53a-54a, and assault in the first degree of Diaz pursuant to § 53a-59 (a). On the count of assault in the first degree, the jury returned separate guilty verdicts under

all three subdivisions of § 53a-59 (a).[14] Subdivision (1) requires that, "[w]ith intent to cause serious physical injury to another person, [the defendant] causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument." Subdivision (2) requires that "with intent to disfigure another person seriously and permanently, or to destroy, amputate or disable permanently a member or organ of his body, [the defendant] causes such injury to such person or to a third person." Subdivision (3) requires that "under circumstances evincing an extreme indifference to human life [the defendant] recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person."

The defendant claims that the jury's verdicts on the attempted murder and assault counts are inconsistent because subdivision (3) of the assault statute requires reckless conduct, while the other two subdivisions of the assault statute and the attempted murder statute[15] all require intentional conduct. The defendant claims that because both counts pertain to the shooting of Diaz, and because a person cannot at one and the same time act both intentionally and recklessly with regard to the same act and the same result; *State* v. *King,* 216 Conn. 585, 594, 583 A.2d 896 (1990); the verdicts of guilty of attempted murder and assault in the first degree are necessarily inconsistent.

---

[14] General Statutes (Rev. to 1989) § 53a-59 (a) specifies three separate and exclusive definitions of assault in the first degree. See footnote 4. The state charged the defendant with committing assault in the first degree against Diaz under subdivision (1), subdivision (2) and subdivision (3) of subsection (a). The trial court instructed the jury to consider each of these three subdivisions and its lesser included offenses. The court did not instruct the jury that the three subdivisions were alternative methods of committing the same crime, and that it could convict under only one subdivision. The jury returned separate guilty verdicts under each of the three subdivisions charged by the state. The trial court accepted all three verdicts.

[15] See footnotes 1 and 3.

The general rule to which we subscribe is that factual " '[c]onsistency in the verdict is not necessary. Each count in an indictment is regarded as if it [were] a separate indictment.' " *State* v. *Stevens,* 178 Conn. 649, 653, 425 A.2d 104 (1979). Where the verdict could have been the result of compromise or mistake, we will not probe into the logic or reasoning of the jury's deliberations or "open the door to interminable speculation." *United States* v. *Zane,* 495 F.2d 683, 690 (2d Cir.), cert. denied, 419 U.S. 895, 95 S. Ct. 174, 42 L. Ed. 2d 139 (1974).

We employ a less limited approach, however, when we are confronted with an argument that the verdicts are inconsistent as a matter of law or when the verdicts are based on a legal impossibility. See *State* v. *Robinson,* 213 Conn. 243, 250–51, 567 A.2d 1173 (1989); *State* v. *Keating,* 151 Conn. 592, 595–96, 200 A.2d 724 (1964), cert. denied sub nom. *Joseph* v. *Connecticut,* 379 U.S. 963, 85 S. Ct. 654, 13 L. Ed. 2d 557 (1965). In response to such a claim, we look carefully to determine whether the existence of the essential elements for one offense negates the existence of the essential elements for another offense of which the defendant also stands convicted. If that is the case, the verdicts are legally inconsistent and cannot withstand challenge. *State* v. *King,* supra, 594–95.

At trial, the defendant neither objected to the jury instructions on assault in the first degree and attempted murder, nor objected to the trial court's acceptance of the verdicts on these counts. The defendant maintains, however, that he is entitled to prevail on this claim under *State* v. *Golding,* supra. We agree.

Once again, the record is adequate, satisfying the first prong of *Golding.* We also conclude that the defendant has satisfied the second prong, which requires that the claim be of constitutional magnitude alleging the

violation of a fundamental right. As discussed earlier in relation to the defendant's first claim, mental state is an essential element of a crime and "[a]n accused has a fundamental right, protected by the due process clauses of the federal and Connecticut constitutions, to be acquitted unless proven guilty of each element of the charged offense beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Williams,* supra, 363. If the defendant's claim of legal inconsistency were valid, it would mean that either the attempted murder conviction or the assault conviction, or both, was necessarily rendered without a finding of the requisite mental state by the jury. Because the lack of consistency bears directly on the essential element of intent and constitutes a constitutional violation, we conclude that the defendant has satisfied the second prong of *Golding.*

The essence of the defendant's claim is that the jury could not, as a matter of law, have found the requisite mental states for all four crimes at issue. In determining whether the verdicts were inconsistent, we must examine the possible scenarios. Under the facts of this case, two possible factual scenarios were available to the jury regarding the attempted murder and assault counts: (1) the defendant intended to kill or injure someone else and, in attempting to do so, injured Diaz inadvertently; or (2) the defendant intended to kill or injure Diaz and, in attempting to do so, injured him. We discuss each of these scenarios in turn.

A

First, if the defendant intended to injure someone else and injured Diaz inadvertently, then the three jury verdicts under the assault statute are not legally inconsistent.[16] The jury could reasonably have concluded

---

[16] Because the trial court imposed only one sentence for first degree assault, no double jeopardy claim has been raised. See *State* v. *John,* 210

that, in attempting to injure or disfigure someone standing near Diaz, the defendant acted recklessly toward Diaz and therefore recklessly caused injury to Diaz, satisfying the elements of subdivision (3). Although we said in *State* v. *King,* supra, that a person could not act intentionally and recklessly with regard to the same act and the same result, here we have two different victims and therefore two different results. The jury therefore could reasonably have found that when the defendant fired the shotgun at the group of ten to fifteen young men on the sidewalk, causing eight pellets to be fired, he intended to injure one or more of them and was reckless with regard to the rest, including Diaz.

With regard to the verdicts under subdivisions (1) and (2) of the assault statute, we conclude that they could be legally consistent with the verdict under subdivision (3). Although subdivisions (1) and (2) each require an intent to cause harm, they provide that this element is satisfied if the victim is injured inadvertently while the defendant is intentionally attempting to harm another person. The statute expressly provides for a transfer of the intent to cause him harm. Even if the defendant merely acted recklessly toward Diaz, he could be guilty under subdivisions (1) and (2) as long as he intended to harm someone, because both subdivisions (1) and (2) provide that a person is guilty if, "with intent to cause serious physical injury . . . or . . . to disfigure another person . . . he causes such injury to such person or to a third person . . . ." The jury therefore could reasonably and consistently have concluded that the defendant was guilty under all three subdivisions of the assault statute.

Conn. 652, 696, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989); *State* v. *Couture,* 194 Conn. 530, 560, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985).

If, however, the defendant had intended to harm someone other than Diaz, pursuant to § 53a-59 (a) (1) and (2), which would also then have exposed him to liability under subdivision (3), he could not also be guilty of the attempted murder of Diaz in violation of §§ 53a-49 and 53a-54a unless the specific intent needed for attempted murder could be transferred from the intended victim to Diaz. This would be an extension of the doctrine of transferred intent that we are not willing to make. As discussed earlier, the intentional murder statute and the first two subdivisions of the first degree assault statute specifically provide for intent to be transferred from the target of the defendant's conduct to an unintended victim. The attempt statute, however, is ambiguous on this issue. It requires that the defendant act "with the kind of mental state required for commission of the crime . . . ."[17] It is not clear from this language whether the legislature meant the doctrine of transferred intent to apply to an attempt crime whenever the statute defining the crime allows the transfer of intent for the completed offense.

Proof of an attempt to commit a specific offense requires proof that the actor intended to bring about the elements of the completed offense. *State* v. *Almeda,* 189 Conn. 303, 309, 455 A.2d 1326 (1983). If the completed offense includes an intent to kill a particular person, the attempt to kill must also include an intent to kill that same person. If an unintended victim is killed, § 53a-54a allows for a transfer of the intent to kill and, accordingly, for the defendant to be prosecuted for the murder of the unintended victim. If the intended victim escapes death, however, it does not alter the fact that he or she was the intended victim and the subject of an attempted murder. If someone other than the intended victim is killed, the defendant would escape prosecution for murder were it not for the transferred intent doctrine.

[17] See footnote 3.

Transferred intent is not needed, however, to ensure that a defendant is prosecuted for attempted murder. A defendant can still be prosecuted for his intent to kill and conduct aimed at killing the intended victim whether a third party is killed or no one is even injured. This result is consistent with the primary purpose in punishing attempt crimes, which is not merely to deter the commission of completed crimes, but is also intended to punish those individuals who have sufficiently manifested their dangerousness. D. Stuart, "The Actus Reus in Attempts," 1970 Crim. L. Rev. 505, 511. The doctrine of transferred intent, generally considered a necessary fiction, is therefore not necessary to prosecute for attempted murder a defendant whose aim was poor.

Neither party has briefed the issue of whether transferred intent should apply in the context of attempt crimes. Our own research has revealed a very small number of jurisdictions that have considered this question and that allow for it.[18] We have said many times that "[c]riminal statutes are not to be read more broadly than their language plainly requires and ambiguities are ordinarily to be resolved in favor of the defendant." *State* v. *McGann*, 199 Conn. 163, 177, 506 A.2d 109 (1986); *State* v. *Russell*, 218 Conn. 273, 277–78, 588 A.2d 1376 (1991); *State* v. *Whiteman*, 204 Conn. 98, 101, 526 A.2d 869 (1987) (penal statutes should be strictly construed in favor of the accused). "It is a fundamental tenet of our law to resolve doubts .in the enforcement of a penal code against the imposition of a harsher punishment." *State* v. *Rawls*, 198 Conn. 111, 121, 502 A.2d 374 (1985). As the United States Supreme Court has noted, "[t]he 'touchstone' of this rule of lenity is 'statutory ambiguity.' *Bifulco* v. *United States*, 447 U.S. 381, 387, 100 S. Ct. 2247, 65 L. Ed. 2d 205 (1980)." Id., 122. "[W]e . . . [reserve] lenity

---

[18] See, e.g., *State* v. *Gillette*, 102 N.M. 695, 703–705, 699 P.2d 626 (1985).

for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to 'the language and structure, legislative history, and motivating policies' of the statute." (Emphasis in original.) *Moskal* v. *United States,* 498 U.S. 103, 108, 111 S. Ct. 461, 112 L. Ed. 2d 449 (1990). Under the circumstances of this case, the rule of lenity leads us to conclude that the transferred intent doctrine should not be applied to the crime of attempted murder. The jury thus had to conclude, in order to convict the defendant of attempted murder of Diaz, that he intended to kill Diaz.

Under this first factual scenario, therefore, the jury could not have found that the defendant simultaneously had the specific intent to kill Diaz while being reckless toward Diaz, in order to convict him under §§ 53a-49, 53a-54a and 53a-59 (a) (3). The jury verdicts were, therefore, legally inconsistent.[19]

B

We next consider the second possible factual scenario in order to determine whether the jury verdicts may be reconciled thereunder. Under this scenario, we assume that the defendant intended to kill Diaz but only injured him. It is clear that an assault in violation of § 53a-59 (a) (1) and (2) would be consistent with an attempted murder count in violation of §§ 53a-49 and 53a-54a if Diaz were the defendant's intended victim, because those statutory sections require intentional

---

[19] With regard to the intent needed for attempted murder, the trial court instructed the jury that it had to determine: "[D]id the defendant on this occasion have the intent to cause the death of another person. And did he take a substantial step in causing the death of another person which then involved Jason Diaz." This charge suggested that the jury could use transferred intent on the attempted murder charge. Because we conclude, however, that transferred intent should not apply to attempted murder as a matter of law, the verdicts, under the first factual scenario, are legally inconsistent.

conduct. The verdict under subdivision (3) of § 53a-59 (a), however, poses a problem, because this subdivision requires reckless rather than intentional conduct. As we said in *State* v. *King,* supra, 594, "[w]here a determination is made that one mental state exists, to be legally consistent the other must be found not to exist." In *King,* we specifically held that a defendant could not be convicted of both attempted murder in violation of §§ 53a-49 and 53a-54a and reckless assault in violation of § 53a-59 (a) (3), for a single act against a single victim. "[J]ury verdicts convicting the defendant of two offenses, each of which requires a mutually exclusive and inconsistent state of mind as an essential element for conviction cannot stand." Id. Under this factual scenario, the defendant, therefore, could not have committed a reckless assault of Diaz, his intended victim.

The state argues, however, that the verdict under subdivision (3) of the assault statute is nevertheless consistent with the three other verdicts because the jury could have found that, in attempting to kill Diaz, the intended victim, the defendant acted recklessly toward others in the crowd, and in the course of such recklessness toward these others, hit his intended target, Diaz. According to the state, this theory allows the defendant to be charged with a reckless assault of the intended victim. Implicit in this argument is the proposition that the mental state of recklessness may properly be transferred under the statute from an unintended victim to an intended victim. We disagree with this proposition.

Although the language of subdivision (3) of the assault statute[20] arguably supports the proposition that recklessness, like intent in subdivisions (1) and (2), may be transferred, this interpretation of the statute is illogical where the transfer is from an unintended victim to an intended victim. We cannot conceive of any rea-

---

[20] See footnote 4.

son why the legislature would have intended such a result.[21] "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result. *King* v. *Board of Education,* 203 Conn. 324, 332–33, 524 A.2d 1131 (1987); *Gentry* v. *Norwalk,* 196 Conn. 596, 606, 494 A.2d 1206 (1985). *Ford Motor Credit Co.* v. *B. W. Beardsley, Inc.,* 208 Conn. 13, 20, 542 A.2d 1159 (1988)." (Internal quotation marks omitted.) *Iovieno* v. *Commissioner of Correction,* 222 Conn. 254, 261, 608 A.2d 1174 (1992); see *Groton* v. *Yankee Gas Services Co.,* 224 Conn. 675, 689, 620 A.2d 771 (1993). We conclude that for the defendant to be liable under § 53a-59 (a) (3), the defendant must injure someone toward whom he has acted recklessly, not someone toward whom he has acted intentionally. In light of this conclusion, it was not possible for the jury to find that the defendant simultaneously possessed both an intent to kill Diaz and recklessness toward Diaz as required for §§ 53a-49, 53a-54a and 53a-59 (a) (3). The jury verdicts were, therefore, legally inconsistent under the second factual scenario.

## C

Because under either of these two possible factual scenarios, the jury verdicts were legally inconsistent, we conclude that the defendant has satisfied the requirement of the third prong of *State* v. *Golding,*

---

[21] Transfer of recklessness is not required in order to prevent the defendant from escaping punishment for being reckless toward X in his attempt to injure Y. If the defendant actually harms X, there would be liability under General Statutes § 53a-59 (a) (3). If only the intended victim, Y, is harmed, the defendant may be held liable for intentional assault of Y under subdivision (1) or (2) and the reckless endangerment of X under General Statutes § 53a-63, which provides: "RECKLESS ENDANGERMENT IN THE FIRST DEGREE: CLASS A MISDEMEANOR. (a) A person is guilty of reckless endangerment in the first degree when, with extreme indifference to human life, he recklessly engages in conduct which creates a risk of serious physical injury to another person."

supra, 240, that a constitutional violation clearly exists and clearly has deprived him of a fair trial. Further, such violation clearly was not harmless. See id., 239–40. We cannot speculate as to what a properly charged jury would have done under the circumstances of this case. As we said in *State* v. *King,* supra, 595, "it is not for this court, on appeal, to make a factual determination as to the defendant's mental state at the time the alleged crime was committed. . . . The inconsistent verdicts, therefore, require that we vacate the defendant's convictions of attempted murder and assault in the first degree and remand only those two counts for a new trial." (Citations omitted.)

### III

Finally, the defendant claims that the trial court improperly allowed the state to exercise peremptory challenges to excuse two African-American venirepersons, Glandine Frazier and Cheryl Hightower. The defendant claims that the state's actions violated his right to a fair trial under the state and federal constitutions, and the venirepersons' constitutional rights under the state constitution. We are unpersuaded.

During jury selection, the state exercised peremptory challenges to excuse Frazier and Hightower. Upon objection by the defendant, the trial court required the state to provide a racially neutral justification for its use of peremptory challenges to excuse them, in accordance with this court's mandate in *State* v. *Holloway,* 209 Conn. 636, 645–46, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989). With respect to Frazier, the state explained that it had excused her because she: (1) had lived within three or four blocks of the crime scene until May, 1990; (2) felt sympathetic to people who get in trouble with the law; (3) had been hearing all her life that the criminal justice system is unfair to African-Americans; and (4) had

read about the case in the newspaper but was not able to provide any details of what she had read. With respect to Hightower, the state explained that it had excused her because she: (1) lived only one or two blocks from the crime scene; and (2) had nodded to the defendant's mother in the courtroom but, when asked on voir dire whether she knew the defendant's mother, she denied knowing her. The state also expressed skepticism of Hightower's claims that she had never heard anything about the case,[22] and had never had contact with the Hartford police department. The court accepted these explanations and excused Frazier and Hightower. The state subsequently accepted two other African-American jurors.

## A

The defendant first claims that the exclusion of Frazier and Hightower constituted purposeful racial discrimination in violation of his equal protection rights under the federal and state constitutions.[23] Thus, the defendant claims, the trial court improperly excused Frazier and Hightower. We disagree.

---

[22] The trial court shared this concern: "It does strike the Court that everybody in the entire community, greater Hartford community, had some knowledge of the happenings on the date and those who were living within a two block area certainly would of, unless they're completely isolated would have known what happens in their own neighborhood, so the concern of the State concerning that particular portion of her voir dire is a concern of the Court as well."

[23] After the burden shifts to the state to demonstrate that its challenges were race-neutral, the defendant's *Batson* claim is treated similarly under the state and federal constitutions. *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); *State* v. *Holloway,* 209 Conn. 636, 641, 553 A.2d 166, cert. denied, 490 U.S. 1071, 109 S. Ct. 2078, 104 L. Ed. 2d 643 (1989); see *State* v. *Smith,* 222 Conn. 1, 10–15, 608 A.2d 63, cert. denied, U.S. , 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992). Because the parties have not argued that there should be a separate and distinct *Batson* analysis under the state constitution, we will continue to address the claims together.

In *Batson* v. *Kentucky,* 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecution in selecting a jury "raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." *State* v. *Gonzalez,* 206 Conn. 391, 394, 538 A.2d 210 (1988); *Batson* v. *Kentucky,* supra, 87–88. The court concluded that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges 'for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." (Citation omitted.) *Batson* v. *Kentucky,* supra, 89.

Once a criminal defendant asserts a *Batson* claim, the prosecution must "advance a neutral explanation for the venireperson's removal. . . . The defendant is then afforded the opportunity to demonstrate that the state's articulated reasons are insufficient or pretextual." (Citation omitted.) *State* v. *Holloway,* supra, 641. "[T]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination." (Internal quotation marks omitted.) *Hernandez* v. *New York,* 500 U.S. 352, 363, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991). Because "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact"; id., 364; that decision "will turn on evaluation of credibility . . . [and] a trial court's determination that there has or has not been intentional discrimination is entitled" to great deference. (Internal quotation marks omitted.) *State* v. *Gonzalez,* supra,

395; *Hernandez* v. *New York,* supra, 365; *Batson* v. *Kentucky,* supra, 98 n.21; *United States* v. *Casper,* 956 F.2d 416, 419 (3d Cir. 1992). Thus, we may not reverse the trial court's finding as to intentional discrimination or lack thereof unless it was clearly erroneous. *Hernandez* v. *New York,* supra, 369; *United States* v. *Briscoe,* 896 F.2d 1476, 1487 (7th Cir.), cert. denied sub nom. *Usman* v. *United States,* 498 U.S. 863, 111 S. Ct. 173, 112 L. Ed. 2d 137 (1990).

"In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law. A court addressing this issue must keep in mind the fundamental principle that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . . Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." (Citations omitted; internal quotation marks omitted.) *Hernandez* v. *New York,* supra, 359–60.

"A neutral explanation in the context of our analysis here means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id. "[T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Batson* v. *Kentucky,* supra, 97. "[T]he . . . process of choosing

[a jury] may be influenced by intuitive assumptions that are not fairly quantifiable . . . ." *United States* v. *Briscoe,* supra, 1489.

We have identified several specific factors that may indicate that the state's excuse of a venireperson through a peremptory challenge was racially motivated. These include, but are not limited to: "(1) The reasons given for the challenge were not related to the trial of the case . . . (2) the prosecutor failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteristics but not the same race as the challenged juror were not struck . . . (5) the prosecutor advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the prosecutor used a disproportionate number of peremptory challenges to exclude members of one race. . . . (Citations omitted.) *State* v. *Gonzalez,* supra, 399." (Internal quotation marks omitted.) *State* v. *Smith,* 222 Conn. 1, 11, 608 A.2d 63, cert. denied, U.S. , 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992).

On the basis of the fourth factor, the defendant claims that the state's justifications for striking Hightower and Frazier were pretextual because: (1) the state accepted Caucasian jurors who, like Frazier, had claimed that they did not know about the crime or could not remember details about the crime; and (2) the state accepted two other African-Americans who, like Hightower and Frazier, lived near the scene.

As to Frazier, the state was concerned about her stated prior exposure to this case through the media and her stated subsequent inability to remember any details about the case despite this exposure, her sym-

pathy towards defendants, her exposure to the belief that the judicial system is unfair to African-Americans, and the fact that, at the time of the crime, she had lived three or four blocks from the crime scene. As to Hightower, the state did not believe her testimony that, although she lived only one to two blocks from the crime scene, she had never heard anything about the case, and that she did not know the defendant's mother, to whom the state observed her nodding in the courtroom. The defendant relies on only two of the state's reasons in making his claim: (1) Frazier's response that she had read about the crime but could not remember any details; and (2) Frazier's and Hightower's residential proximity to the crime scene. The defendant claims that these justifications are pretextual and demonstrate the state's purposeful discrimination. We disagree.

Even if we disregard the state's other justifications and focus solely on the two reasons challenged by the defendant, the defendant has not proved purposeful discrimination by the state. Each of these two reasons is a facially race-neutral and legitimate reason for exercising a peremptory challenge. Exposure to pretrial publicity concerning the case is a legitimate concern and facially race-neutral. *United States* v. *Roberts,* 913 F.2d 211, 214 (5th Cir. 1990), cert. denied sub nom. *Preston* v. *United States,* 500 U.S. 955, 111 S. Ct. 2264, 114 L. Ed. 2d 716 (1991) (exposure to pretrial publicity sufficient justification for exclusion from jury); *United States* v. *Mitchell,* 877 F.2d 294, 303 (4th Cir. 1989) (exposure to pretrial publicity race-neutral explanation for peremptory challenge). Moreover, although Hightower stated that she had had no exposure to the case, the prosecutor was skeptical of her response because she lived only a block away from the scene of this highly publicized crime. Additionally, the state was unaccepting of Frazier's inability to recall details. "[T]he fact that a prosecutor distrusts a juror or finds

his responses not to be credible has also been held to be a sufficiently race-neutral reason for using a peremptory challenge." *Stephens* v. *State,* 580 So. 2d 11, 20 (Ala. Crim. App. 1990); *Rodgers* v. *State,* 725 S.W.2d 477, 480 (Tex. App. 1987). Both the prosecutor and the trial court judge in this case found it "incredible" that Hightower, a resident of the crime scene area, had never heard about the crime. See, e.g., *Stephens* v. *State,* supra, 20 (race-neutral reason for peremptory challenge when resident of community "had absolutely no knowledge of the crime 'extremely strange' in light of the fact that every other juror from that particular community had heard of the incident"); see *State* v. *Smith,* supra, 12.

This rationale, the defendant maintains, is a pretext for intentional discrimination because the state accepted Caucasian venirepersons who responded that they had not heard of the case or could not recall details about the case.[24] None of these venirepersons, however, lived as close to the crime scene area as Hightower and Frazier. In addition to hearing the state's reasons under challenge, the trial court also heard the state express concern regarding Hightower's obvious nod to the defendant's mother, whom she denied knowing, and heard the state's reservations regarding Frazier's sympathy to African-Americans whom she perceived were treated unfairly by the criminal justice system. The trial court concluded that the state's justifications were legitimate, race-neutral reasons for excusing Hightower and Frazier. We cannot conclude that these findings were clearly erroneous.

---

[24] The following venirepersons testified that they had had no exposure to publicity about the case: Jacqueline Shea, Larissa Borst, Paul Sorbello, Katherine Dang, Pamela Blourin, Nadine Wenz, Douglas Gill, Charles Cyr and Marilyn Vardo. Leon Olson testified that he had heard about the case, but could not recall any details about it. Although the record before this court does not disclose the race of these venirepersons, the state does not dispute that these venirepersons were Caucasian.

The defendant's next claim is based on a variation of the fourth factor. The defendant claims that the state's explanation that Frazier and Hightower were excused, in part, based upon their residency close to the scene was insufficient or pretextual because the state accepted two other African-Americans who also lived near the scene. We disagree.

Residency near the crime scene is a valid reason for striking prospective jurors. *Williams* v. *Chrans,* 957 F.2d 487, 490 (7th Cir.), cert. denied, U.S. , 113 S. Ct. 595, 121 L. Ed. 2d 533 (1992); *United States* v. *Bennett,* 928 F.2d 1548, 1553 (11th Cir. 1991); *United States* v. *McAnderson,* 914 F.2d 934, 942 (7th Cir. 1990); *United States* v. *Briscoe,* supra, 1488; *United States* v. *Ruiz,* 894 F.2d 501, 507 (2d Cir. 1990); see *State* v. *Esposito,* 223 Conn. 299, 306–12, 613 A.2d 242 (1992). Persons who live in the neighborhood where the crime occurs "might improperly bring knowledge of persons or places involved in the trial to the deliberations." *United States* v. *Williams,* 936 F.2d 1243, 1247 (11th Cir.), cert. denied sub nom. *Smith* v. *United States,* U.S. , 112 S. Ct. 612, 116 L. Ed. 2d 635 (1991); *United States* v. *Mitchell,* supra, 303 (peremptory strike of residents of defendant congressman's home district did not violate *Batson*). Such persons might also have a personal interest in the outcome of the prosecution. *United States* v. *Uwaezhoke,* 995 F.2d 388, 394 n.5 (3d Cir. 1993) ("juror living in a neighborhood with a drug problem may fear retaliation from dealers there if she votes to convict an alleged drug trafficker or may have had an unpleasant contact with the police in the context of drug trafficking"); *United States* v. *McAnderson,* supra; *United States* v. *Briscoe,* supra; see, e.g., *State* v. *Esposito,* supra.

We hold that the trial court was justified in concluding that residency was a sufficient as well as a valid explanation in this case. The two African-American

venirepersons who were accepted, Arlene Dunn and Veains Jones, lived much farther from the crime scene than Frazier and Hightower. Dunn lived at least ten blocks from the crime scene, probably more. Jones lived in the Flatbush Avenue area of Hartford, which is across town from the crime scene.[25] Temporally and proximately, Dunn's and Jones' connection to the neighborhood was more attenuated than Frazier's and Hightower's, and neither Dunn nor Jones posed the same credibility problems that Frazier and Hightower displayed. There was a real distinction, therefore, between the African-American venirepersons who were excused and those who were not. Even if Jones and Dunn had lived in the vicinity of the crime scene, however, the fact that they were accepted as jurors weakens the defendant's argument that the state's use of peremptory challenges against Hightower and Frazier on the basis of residency was racially motivated. The state's legitimate concern regarding the degree of connection to the neighborhood and the venirepersons' attitudes, beliefs and credibility demonstrates race-neutral reasons for striking Hightower and Frazier. The trial court could reasonably accept the state's peremptory challenges.

## B

The defendant further claims that his right to an impartial jury under the Connecticut constitution was violated by allowing the state to exercise peremptory challenges against venirepersons solely on the basis of the proximity of their residence to the crime scene. The defendant contends that this rationale will allow the state to exclude venirepersons on "racial grounds dis-

---

[25] Jones had once lived in the area of the crime scene, but her family moved when she was only five years old.

guised as residence grounds" in contravention of the rationale behind *Batson*.[26] We disagree.

We recognize that, under some circumstances, excusing a venireperson on the basis of residency might have an unconstitutionally disparate impact on certain racial groups. Because some neighborhoods are predominately composed of a particular racial group, any systematic exclusion of venirepersons based solely on residency could, if left unscrutinized, be a pretext for discrimination. See *United States* v. *Uwaezhoke*, supra; *Williams* v. *Chrans*, supra, 489–90; *United States* v. *Briscoe*, supra, 1488. Because this rationale may be subject to abuse, the trial court should be wary of allowing residency near the crime scene to be a ground for excusing venirepersons. See *Williams* v. *Chrans*, supra, 490.

These concerns, however, do not compel a finding in this case that the state had such a motive in its challenge to these two venirepersons. *Batson* and its progeny require that the state's reasons for striking a venireperson be "a neutral explanation related to the particular case to be tried." *Batson* v. *Kentucky*, supra, 98; *Hernandez* v. *New York*, supra, 360–61. "[D]isparate impact should be given appropriate weight in determining whether the prosecutor acted with a forbidden intent, but it will not be conclusive in the preliminary

---

[26] In his brief, the defendant states that the residency rationale is unconstitutional under article first, §§ 8 and 19, of the Connecticut constitution. Reference to these constitutional provisions suggests a challenge to the lack of a fair cross section of the community represented in the venire. See *Holland* v. *Illinois*, 493 U.S. 474, 110 S. Ct. 803, 107 L. Ed. 2d 905, reh. denied, 494 U.S. 1050, 110 S. Ct. 1514, 108 L. Ed. 2d 650 (1990); *State* v. *Couture*, 194 Conn. 530, 548–52, 482 A.2d 300 (1984), cert. denied, 496 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985). The defendant's analysis, however, focuses on *Batson* and its progeny. We therefore review this claim under *Batson*. Our analysis is consistent with the United States Supreme Court's recent treatment of a similar disparate impact claim. *Hernandez* v. *New York*, 500 U.S. 352, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991).

race-neutrality step of the *Batson* inquiry." *Hernandez* v. *New York,* supra, 362. "The effect of the state's proffered reasons for using peremptory strikes is only part of the equation a court may use to assess the credibility of the prosecutor's explanation." *Williams* v. *Chrans,* supra, 490; *Hernandez* v. *New York,* supra, 1868.

The state presented other unchallenged reasons for its decision to excuse these venirepersons. The state was concerned about Frazier's sympathy for people who get in trouble with the law; see *State* v. *Smith,* supra, 13–14 (state's belief that venireperson's bias against the government due to negative encounter with police a legitimate and race-neutral explanation); and that she had been hearing all her life that the criminal justice system is unfair to African-Americans. See id. As to Hightower, although the state had observed her nod to the defendant's mother, she subsequently denied knowing her. See *United States* v. *Ruiz,* supra, 506 (prosecutor observed that challenged venireperson "star[ed] strangely" at government investigator sitting at counsel table and then was not " 'particularly articulate' " in responding to prosecutor's questions); *United States* v. *Lance,* 853 F.2d 1177, 1181 (5th Cir. 1988) (prosecutor's observation of eye contact and demeanor was significant and constituted neutral explanation of peremptory exclusion). Each of these explanations is facially race-neutral. Moreover, "[t]he . . . process of choosing [a jury] . . . may be influenced by intuitive assumptions that are not fairly quantifiable . . . ." *United States* v. *Briscoe,* supra, 1489.[27]

---

[27] The defendant also argues that excusing a juror on the basis of the juror's residence violates the "individual juror's right to the free exercise of her constitutional duty to serve on an petit jury under article first, § 20." In light of our conclusion that residence is a legitimate basis upon which to exercise a peremptory challenge, we need not address the issue of whether the Connecticut constitution adopts *Powers* v. *Ohio,* 499 U.S. 400, 413–16,

In view of these factors and all the relevant circumstances, we are not persuaded that the trial court was clearly mistaken in its conclusion that the state had not engaged in purposeful racial discrimination when it excused Frazier and Hightower. In addition to the state's facially valid explanations, we note that the jury ultimately impaneled included two African-Americans. "Although the racial composition of the jury impaneled is certainly not dispositive of the issue, since 'the striking of even one juror on the basis of race violates the equal protection clause, even when other jurors of the defendant's race were seated'; *State* v. *Gonzalez,* supra, 400; it is a factor that we must consider in assessing the prosecutor's explanation for striking [Hightower and Frazier]." *State* v. *Smith,* supra, 13; *State* v. *Holloway,* supra, 644. Moreover, there were at least five African-American members of the venire. Of the eighteen allotted peremptory challenges, the state used a total of eleven. Of those eleven, it struck three African-Americans and accepted two of them. The fact that two African-American jurors were seated when the state had seven allotted peremptory challenges remaining, supports the trial court's finding that the state had not engaged in purposeful discrimination. *United States* v. *Briscoe,* supra, 1489; *State* v. *Holloway,* supra. Accordingly, we affirm the trial court's conclusion that the state did not have a discriminatory purpose in exercising its peremptory challenges to strike Hightower and Frazier.

The judgment is reversed in part, and the case is remanded to the trial court for a new trial on the charges of attempted murder and assault in the first degree.

In this opinion the other justices concurred.

111 S. Ct. 1364, 113 L. Ed. 2d 411 (1991), in which the United States Supreme Court held that a defendant has standing to bring an equal protection claim on behalf of a venireperson. Because we find that the trial court was not clearly erroneous in accepting the state's reasons as race-neutral, we leave this issue for another day.