STATE OF CONNECTICUT *v.* TRENDEL TUTSON
(AC 24066)

Flynn, C. J., and Bishop and McLachlan, Js.

Argued September 26, 2006—officially released February 20, 2007

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Michele C. Lukban*, assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. This appeal is before us on remand from the Supreme Court. In *State* v. *Tutson*, 278 Conn. 715, 899 A.2d 598 (2006), the Supreme Court reversed the decision of this court in *State* v. *Tutson*, 84 Conn. App. 610, 854 A.2d 794 (2004), with direction to consider the remaining issues on appeal. The remaining claim of the defendant, Trendel Tutson, on appeal is that the trial court's instructions impermissibly allowed the jury to find him guilty of attempt to commit murder under the doctrine of transferred intent. We affirm the judgment of the trial court.[1]

---

[1] The state raised a claim that the court improperly merged the defendant's conviction of attempt to commit murder and his conviction of assault in the first degree. Although the judgment file in this matter indicates that the court merged the defendant's sentences, it is apparent from the transcripts

The following facts, set forth by this court in our earlier opinion, are relevant to the resolution of the issue before us. "[O]n March 26, 2001, between 1 and 1:30 p.m. . . . Ernesto Molina was driving a 1992 red Volkswagen Jetta on Bond Street in Hartford, looking to buy marijuana. Molina was joined by two passengers, Jorge Pagan, Molina's best friend, who sat in the front passenger seat, and Michael Alvarado, who sat in a backseat. As the vehicle traveled on Bond Street, Molina and Pagan noticed a small white car traveling toward them in the opposing lane. They also noticed that there was a passenger in the front seat. As the cars passed, Molina and Pagan saw the face of the driver of the white car.

"After the vehicles passed, the white car turned around and, with increasing speed, began following the red Jetta on Bond Street. Molina and Pagan noticed this and became concerned. In an attempt to elude the car, Molina increased his speed to eighty-five to ninety-five miles per hour and drove through stop signs and traffic lights. Molina ultimately turned onto Brownell Avenue and the white car did the same. As the cars were traveling at fifty-five miles per hour, Molina looked in his rearview mirror and saw a long black pole, which he thought was a rifle, come out of the driver's side window of the white car and turn in the direction of the Jetta. Molina then heard a noise and felt something strike the back of his head. A large caliber bullet had

that the court intended to impose concurrent sentences for the defendant's conviction of the two crimes. It is not necessary for us to reconcile this discrepancy in the record, however, because the state has not filed a cross appeal and has not sought plain error review. We therefore decline to address this issue. See Practice Book § 61-8; see also *William Raveis Real Estate, Inc.* v. *Newtown Group Properties Ltd. Partnership*, 95 Conn. App. 772, 773 n.3, 898 A.2d 265 (2006); *Board of Police Commissioners* v. *White*, 171 Conn. 553, 557, 370 A.2d 1070 (1976); *Wesleyan University* v. *Rissil Construction Associates, Inc.*, 1 Conn. App. 351, 355, 472 A.2d 23, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984).

pierced the back of the Jetta and traveled through the vehicle's trunk and passenger compartment. A fragment of that bullet lodged in the back of Molina's head. Although injured, Molina kept driving, turning right onto Broad Street and continuing to Hartford Hospital. The white car did not follow the Jetta, turning left onto Broad Street instead.

"At the hospital, the police immediately were notified of the incident. They arrived at the hospital shortly thereafter and briefly spoke with Molina, Pagan and Alvarado regarding the shooting. The police also conducted a formal interview of Pagan at the police station during which Pagan described the driver and passenger of the white car.

"Approximately one hour after arriving at the hospital, the police were contacted by the security department from the Learning Corridor (Corridor). The police were told that a member of the Corridor's security personnel was walking to lunch between 1 and 1:30 p.m., when he heard what sounded like a gunshot resonating from Brownell Avenue. The police also were notified that this security officer searched Brownell Avenue after he learned about the shooting and recovered a twelve gauge shotgun shell from the north side of the street. The police ultimately took the shell into their possession. At that time, it was neither dirty nor rusty and did not appear to have been on the street for a long time. The shell, however, was never tested for fingerprints. The police also took a videotape from the Corridor's exterior surveillance camera. That tape revealed that two vehicles, one red, one white, were on Brownell Avenue and that the red vehicle turned right onto Broad Street while the white vehicle turned left. Neither gunfire nor the make of the vehicles could be discerned from the video[tape]. In addition, the video[tape] was time stamped in a manner that made it

unclear that the events depicted actually occurred on March 26, 2001.

"Approximately twelve hours after the shooting, at roughly 2 a.m. on March 27, 2001, Pagan, while driving to a gas station to buy a beverage, observed that he was being followed by the defendant in a white Dodge Neon (Neon). Pagan immediately notified police officers that the vehicle that had been involved in the earlier shooting was following him. The police located the Neon and pursued it, but it fled, turning its headlights off in the process. Shortly thereafter, the police located the vehicle in the rear yard of 51 Whitmore Street. The vehicle appeared abandoned; the engine was not running, although it was still warm, and the doors were wide open. A short distance away, the police found the defendant and Philip Washington hiding beneath some cars. Thereafter, the police brought Pagan to the scene where he positively identified the defendant as the driver of the Neon in the earlier shooting and Washington as its passenger.

"The police subsequently discovered that Rooty Thomas, who lived in Meriden, was the lessee of the Neon. Once contacted, Rooty Thomas gave the police permission to search the vehicle.

"The police performed gunshot residue tests on the hands of the defendant and Washington as well as on the exterior and interior surfaces of the driver's and passenger's doors of the Neon. These tests disclosed lead particles on the palm of the defendant's left hand as well as on the back of his right hand. They further revealed the presence of lead, barium and antimony on the palm of Washington's left hand and lead particles on the exterior of the vehicle's passenger door.

"On April 5, 2001, Molina identified the defendant from a photographic array shown to him by the Hartford

police and, on March 8, 2002, Pagan did the same. No weapon was ever recovered." Id., 612–15.

On appeal, the defendant asserts that the court improperly charged the jury and, thus, caused him to be found guilty of attempt to commit murder on the basis of the theory of transferred intent. The defendant failed to preserve his claim at trial and now requests review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We will review the defendant's claim because the record is adequate for review, and he has raised a claim of constitutional magnitude. See *State* v. *Fasano*, 88 Conn. App. 17, 24, 868 A.2d 79 (following established rule that claimed improper jury instruction on element of charged offense appealable even if not raised at trial), cert. denied, 274 Conn. 904, 876 A.2d 15 (2005), cert. denied, 546 U.S. 1101, 126 S. Ct. 1037, 163 L. Ed. 2d 873 (2006). We conclude, however, that the defendant has failed to show that the alleged violation clearly exists and clearly deprived him of a fair trial.

"[W]hether a jury instruction is improper is gauged by considering the instruction in its entirety, and with reference to the facts and evidence in the case, so as to determine whether it fairly presented the case to the jury so that no injustice was done under established legal rules." (Internal quotation marks omitted.) *State* v. *Arrington*, 81 Conn. App. 518, 522–23, 840 A.2d 1192, cert. granted on other grounds, 268 Conn. 922, 846 A.2d 881 (2004) (appeal withdrawn, judgment vacated April 21, 2005).

In the information with bill of particulars, the state charged the defendant with attempt to commit murder and specified that "on or about the 26th day of March, 2001, the [defendant], acting with the kind of mental state required for the commission of the crime of murder . . . intentionally did an act which under the circumstances as he believed them to be was an act

constituting a substantial step in a course of conduct, planned to culminate in his commission of the crime of murder, in violation of [General Statutes §§] 53a-49, and 53a-54a of the Connecticut General Statutes . . . ." Although the information identified the three men in the Volkswagen and included a synopsis of the car chase, nowhere did it identify any particular victim as the object of the intended murder. Rather, the information alleged that "the defendant either pointed a shotgun through the driver's window of the Dodge Neon and fired a shot at the Volkswagen causing the injuries complained of in the second count of the information[2] OR assisted Philip Washington who fired the shotgun through the passenger's window, by driving the Neon and engaging it in pursuit of the Volkswagen through city streets which were acts intended to aid and assist Philip Washington in the catching of the Volkswagen, shooting the victim and causing the injuries alleged in the second count." Thus, absent from the bill of particulars was the identity of any intended victim. Additionally, at trial, the state did not seek to designate any of the three passengers in the Volkswagen as the intended murder victim.

In its charge to the jury, the court reiterated the state's two theories: (1) that the defendant acted as a principal in driving the white Neon, chasing the red Jetta, maneuvering the Neon behind the Jetta and actually discharging the weapon, which resulted in the injury to the victim, or (2) that the defendant was the operator of the white Neon and by maneuvering it, intentionally aided his passenger in firing the weapon, which resulted in the injury to the victim. The court then explained: "The defendant is charged with attempting to commit

---

[2] In the second count, the state accused the defendant of assault in the first degree, alleging that with intent to cause physical injury to another person, he caused such injury to such person, by means of the discharge of a firearm, in violation of General Statutes § 53a-59 (a) (5).

the crime of murder. Under our law, the attempt to commit a crime, even if that attempt is not successful, is just as criminal as actually committing the attempted crime. This requires, therefore, that I explain to you both the elements of the crime of murder, the crime which the state claims that the defendant attempted, and the elements of the separate crime of attempting to commit that crime of murder. First, I will discuss with you the elements of the underlying crime of murder. The relevant statute provides, quote, a person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or a third person. For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt that the defendant intended to cause the death of another person and that the defendant intended—because he's charged with attempt— that in accordance with that intent, the defendant did anything which intentionally aided the passenger to inflict the injury alleged." The court explained to the jury that in order to find the defendant guilty, the state must establish beyond a reasonable doubt "that the defendant must have acted with the kind of mental state required for the commission of the crime of murder which is attempted, which is the intent to cause the death of another. And acting with that intent, he did something, which, under the circumstances as he believed them to be, was an act constituting a substantial step in a course of conduct planned to end in his commission of the crime." The court continued by stating that the defendant "must have acted with the same intent, the same state of mind, required for the crime of murder, which I have just explained to you, and that is the intent to cause the death of another, the three people in the Volkswagen Jetta. The state does not have to show which one was the intended [victim; it] only . . . must prove the intent, that he intended to cause

the death of another person, which would be any one of the three. I refer you to my earlier charge on intent, what it means and how it may be proven, and what the intent is that is required for the crime of murder. And I instruct you to apply that charge here, and that is that he intended to cause the death of another person in the Jetta."

The defendant claims that because the court read the murder statute to the jury, the court, by implication, improperly charged the jury on the doctrine of transferred intent. We disagree. Because the attempt to commit a crime implicates the elements of the underlying crime,[3] the court correctly instructed the jury on the elements of the crime of murder in order to charge the jury properly on the crime of attempted murder. Thus, our review of the record leads us to the conclusion that the court did not charge in accordance with the theory of transferred intent.

The doctrine of transferred intent "was created to apply to the situation of an accused who intended to kill a certain person and by mistake killed another. His intent is transposed from the person to whom it was directed to the person actually killed." (Internal quotation marks omitted.) *State* v. *Higgins*, 265 Conn. 35, 51, 826 A.2d 1126 (2003). As noted by the defendant, the doctrine of transferred intent is not applicable to the crime of attempted murder. See *State* v. *Hinton*, 227 Conn. 301, 318, 630 A.2d 593 (1993).

Here, as noted, the court did not instruct the jury that it could find the defendant guilty even if he did not kill his intended victim but instead wounded another. In

[3] Under General Statutes § 53a-49 (a), a person is guilty of an attempt to commit a crime if in acting with the kind of mental state required for the commission of the crime, he intentionally does anything that, under the circumstances as he believes them to be, is an act constituting a substantial step in a course of conduct planned to culminate in the commission of the crime.

fact, as noted, the state never identified or offered any evidence as to the identity of a specific victim. Because the state did not prosecute the defendant under a theory of transferred intent, and the jury received no instructions on the doctrine, the defendant has failed to prove that a constitutional violation clearly exists and that it deprived him of a fair trial.

The judgment is affirmed.

In this opinion the other judges concurred.

