# STATE OF CONNECTICUT *v.* SANTOS MIRANDA
## (SC 16271)

McDonald, C. J., and Borden, Norcott, Katz, Palmer,
Sullivan and Vertefeuille, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument. Although Chief Justice McDonald reached the mandatory age of retirement before the date that this opinion officially was released, his continued participation on this panel is authorized by General Statutes § 51-198 (c).

Argued November 2, 2000—officially released April 16, 2002

*Robert J. Scheinblum*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Elpedio Vitale*, senior assistant state's attorney, for the appellant-appellee (state).

*Susan M. Cormier*, with whom was *Kenneth J. Bartschi*, for the appellee-appellant (defendant).

*Opinion*

VERTEFEUILLE, J. This case returns to us for a second time. See *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998). In these certified appeals, the state appeals and the defendant, Santos Miranda, cross appeals from the judgment of the Appellate Court on remand from this court. See *State* v. *Miranda*, 56 Conn. App. 298, 313–14, 742 A.2d 1276 (2000). The state claims that the Appellate Court improperly concluded that the defendant's convictions on six[1] counts of the crime of assault in the first degree in violation of General Statutes § 53a-59 (a) (3)[2] deprived him of due process of law under the fourteenth amendment to the United States constitution. In his cross appeal, the defendant claims that: (1) there was insufficient evidence to convict him of assault in the first degree in violation of § 53a-59 (a) (3) and risk of injury to a child in violation of General Statutes (Rev. to 1991) § 53-21;[3] (2) his con-

[1] The state concedes that the defendant's assault convictions were premised on two separate acts of omission, which led to two, rather than six, discrete injuries. Accordingly, the state concedes that the defendant should have been convicted of two rather than six counts of assault in the first degree and requests that this court affirm the trial court's judgment with respect to counts five and ten of the substitute information and vacate the judgment with respect to the remaining four assault counts.

[2] General Statutes § 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." The defendant's six assault convictions consisted of two counts of unspecified reckless conduct, two counts of reckless conduct by allowing the victim to live in a situation of child abuse and two counts of reckless conduct by failing to take measures to prevent the child from living in such a situation.

[3] General Statutes (Rev. to 1991) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be

viction of two counts of assault in the first degree; see footnote 1 of this opinion; violates the prohibition against double jeopardy under the United States constitution; and (3) his convictions for assault in the first degree and risk of injury to a child violate the prohibition against double jeopardy under the United States constitution. We agree with the state's claim on appeal and disagree with the defendant's claims in the cross appeal. Accordingly, we reverse the judgment of the Appellate Court.

The following facts and procedural history guide our resolution of these appeals. "The defendant commenced living with his girlfriend and her two children in an apartment [in Meriden] in September, 1992. On January 27, 1993, the defendant was twenty-one years old, his girlfriend was sixteen, her son was two, and her daughter, the victim in this case, born on September 21, 1992, was four months old. Although he was not the biological father of either child, the defendant took care of them and considered himself to be their stepfather. He represented himself as such to the people at Meriden Veteran's Memorial Hospital where, on January 27, 1993, the victim was taken for treatment of her injuries following a 911 call by the defendant that the child was choking on milk. Upon examination at the hospital, it was determined that the victim had multiple rib fractures that were approximately two to three weeks old, two skull fractures that were approximately seven to ten days old, a brachial plexus injury to her left arm, a rectal tear that was actively 'oozing blood' and bilateral subconjunctival nasal hemorrhages. On

fined not more than five hundred dollars or imprisoned not more than ten years or both."

We refer herein to the 1991 revision of § 53-21 since the charges against the defendant arose out of conduct that occurred on divers dates between October, 1992, and January, 1993. The 1991 revision and the 1993 revision, as referred to by the Appellate Court; see *State* v. *Miranda*, supra, 56 Conn. App. 300 and n.2; are substantively identical.

the basis of extensive medical evidence, the trial court determined that the injuries had been sustained on three or more occasions and that none of the injuries had been the result of an accident, a fall, events that took place at the time of the child's birth, cardiopulmonary resuscitation, a blocked air passageway or the child choking on milk. Rather, the trial court found that the injuries, many of which created a risk of death, had been caused by great and deliberate force.

"The trial court further found in accordance with the medical evidence that, as a result of the nature of these injuries, at the time they were sustained the victim would have screamed inconsolably, and that her injuries would have caused noticeable physical deformities, such as swelling, bruising and poor mobility, and finally, that her intake of food would have been reduced. The court also determined that anyone who saw the child would have had to notice these injuries, the consequent deformities and her reactions. Indeed, the trial court found that the defendant had been aware of the various bruises on her right cheek and the subconjunctival nasal hemorrhages, as well as the swelling of the child's head, that he knew she had suffered a rectal tear, as well as rib fractures posteriorly on the left and right sides, and that he was aware that there existed a substantial and unjustifiable risk that the child was exposed to conduct that created a risk of death. The trial court concluded that despite this knowledge, the defendant 'failed to act to help or aid [the child] by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and guarding her from future abuses. As a result of his failure to help her, the child was exposed to conduct which created a risk of death to her and the child suffered subsequent serious physical injuries . . . .' " *State* v. *Miranda*, supra, 245 Conn. 212–14.

"The trial court concluded that the defendant had a legal duty to protect the health and well-being of the child based on the undisputed facts that he had established a familial relationship with the child's mother and her two children, that he had voluntarily assumed responsibility for the care and welfare of both children, and that he considered himself the victim's stepfather. On the basis of these circumstances, the trial court found the defendant guilty of one count of [risk of injury to a child under] § 53-21 and six counts of [assault in the first degree under] § 53a-59 (a) (3)."[4] Id., 214. "The court imposed a total effective sentence of forty years imprisonment." Id., 211–12.

The defendant appealed from the judgment of conviction to the Appellate Court, which affirmed the conviction for risk of injury to a child,[5] but reversed the assault convictions, concluding that the defendant had no legal duty to act under the circumstances of this case. *State v. Miranda*, 41 Conn. App. 333, 341, 675 A.2d 925 (1996). After granting the state's petition for certification, this court concluded that, based upon the trial court's findings that the defendant had established a familial relationship with the victim's mother and her two children, had assumed responsibility for the welfare of the chil-

---

[4] The trial court found the defendant not guilty of nineteen other counts of assault in the first degree. Those counts had charged him with either personally having inflicted the injuries or not having prevented the child's mother from inflicting the injuries. Although the trial court never stated who actually had caused the injuries, in the initial appeal before this court, we took judicial notice that the child's mother had entered a plea of nolo contendere to the crimes of intentional assault in the first degree and risk of injury to a minor. She received a sentence of twelve years incarceration suspended after seven years. See *State v. Miranda*, supra, 245 Conn. 211–12 n.4.

[5] In the defendant's initial appeal, the Appellate Court declined to consider the defendant's sufficiency of the evidence claim on the risk of injury count on the basis that it had been briefed inadequately. See *State v. Miranda*, 41 Conn. App. 333, 338, 675 A.2d 925 (1996); see also *State v. Miranda*, supra, 245 Conn. 212 n.5.

dren, and had taken care of them as though he were their father, the defendant had assumed a legal duty to protect the victim from abuse.[6] *State* v. *Miranda*, supra, 245 Conn. 226. We therefore reversed the judgment of the Appellate Court and remanded the case to that court for consideration of the defendant's claims of insufficient evidence; id., 231; and "any constitutional claims of due process and double jeopardy arising as a result of this decision . . . ." Id., 231–32 n.25.

On remand, the Appellate Court affirmed the judgment of conviction of risk of injury to a child in violation of § 53-21, reversed the judgment of conviction of six counts of assault in the first degree under § 53a-59 (a) (3), and remanded the case with direction to render judgment of not guilty as to the assault counts. *State* v. *Miranda*, supra, 56 Conn. App. 313–14. Specifically, the Appellate Court concluded that convicting the defendant of assault in the first degree under § 53a-59 (a) (3) would violate the defendant's due process rights because a person of ordinary intelligence in the defendant's circumstances would not have known that he had a duty to protect the child. Id., 311–12. These certified appeals followed.

I

We first address the state's claim that the Appellate Court improperly concluded that the defendant's conviction of assault in the first degree in violation of § 53a-59 (a) (3) deprived him of due process of law under the fourteenth amendment to the United States consti-

---

[6] The defendant has never claimed on appeal that the trial court's findings of fact were clearly erroneous. See *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992) ("The trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . We cannot retry the facts or pass on the credibility of the witnesses." [Internal quotation marks omitted.]). We, therefore, accept those findings for purposes of this appeal. See *State* v. *Miranda*, supra, 245 Conn. 212 n.6.

tution. The state contends that our application of § 53a-59 (a) (3) in *State* v. *Miranda,* supra, 245 Conn. 209, was reasonably foreseeable, as it was based on ordinary tools of statutory construction. Specifically, the state asserts that a person of ordinary intelligence in the defendant's position should have known that this court would find that the defendant had a common-law duty to help the victim in this case and that his violation of that duty exposed him to criminal liability under § 53a-59 (a) (3). The state points to four sources that provided the defendant with such notice: the plain language of § 53a-59 (a) (3); the common-law history of § 53a-59 (a) (3); the law of neighboring jurisdictions; and related statutes.

In response, the defendant contends that the Appellate Court properly concluded that our construction of § 53a-59 (a) (3) violated the fair warning requirement embodied in *Bouie* v. *Columbia,* 378 U.S. 347, 350–51, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). *State* v. *Miranda,* supra, 56 Conn. App. 307–308. Specifically, the defendant claims that the Appellate Court correctly concluded that our decision in *State* v. *Miranda,* supra, 245 Conn. 209, was an unforeseeable judicial expansion of § 53a-59 (a) (3) because he had no way of knowing that the statute imposed liability on him for failing to help the victim under the facts of this case. We agree with the state.

The Appellate Court concluded that our decision in *State* v. *Miranda,* supra, 245 Conn. 209, violated the defendant's constitutional right to due process because a person of ordinary intelligence in the defendant's position would not have known that he had a duty to help the child under the circumstances of this case. *State* v. *Miranda,* supra, 56 Conn. App. 307–308. In its decision, the Appellate Court recognized that when this case was initially appealed to the Appellate Court, a panel of three judges had determined that a person who is neither the

biological nor legal parent of a child does not owe that child a duty to protect the child. Id., 306. The Appellate Court also noted that in the first appeal to this court, one justice also had concluded that the defendant owed no legal duty to the victim and that two other justices had expressed concern that applying the duty to the defendant may violate his constitutional right to due process. Id. The Appellate Court determined, therefore, that "[i]f the judges and justices of our Appellate and Supreme Courts cannot agree as to whether the statute put the defendant on notice that he had a duty to protect the [victim], we cannot conclude that the defendant would have known that he was committing assault in the first degree when he failed to protect the [victim], to secure medical treatment for her or to report the situation to the authorities." Id., 308. As a result, the Appellate Court reversed the defendant's convictions for assault in the first degree in violation of § 53a-59 (a) (3) as an unforeseeable judicial expansion of that statute. Id.

We begin by setting forth the legal principles that apply to an alleged due process violation based on lack of fair warning. "The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by [the United States Supreme] Court. . . . The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." (Citation omitted; internal quotation marks omitted.) *Bouie* v. *Columbia*, supra, 378 U.S. 350–51. "It is settled that the fair-warning requirement embodied in the Due Process Clause prohibits the States from holding an individual criminally responsible for conduct which he

could not reasonably understand to be proscribed." (Internal quotation marks omitted.) *Rose* v. *Locke*, 423 U.S. 48, 49, 96 S. Ct. 243, 46 L. Ed. 2d 185 (1975).

"There are three related manifestations of the fair warning requirement. First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . . Second . . . the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." (Citations omitted; internal quotation marks omitted.) *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997). Third, "[t]here can be no doubt that a deprivation of the right of fair warning can result . . . also from an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie* v. *Columbia*, supra, 378 U.S. 352. "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States* v. *Lanier*, supra, 267.

It is the third of these three manifestations of the fair warning requirement that is involved in the present case. The Appellate Court concluded that our decision in *State* v. *Miranda*, supra, 245 Conn. 209, violated the fair warning principle announced in *Bouie* because it was "an unforeseeable and retroactive judicial expansion of narrow and precise statutory language." *Bouie* v. *Columbia*, supra, 378 U.S. 352; see *State* v. *Miranda*, supra, 56 Conn. App. 307. The state challenges this conclusion, arguing that our recognition of a common-law duty that required the defendant to protect the victim from harm under the circumstances of this case and our construction of § 53a-59 (a) (3) so as to encom-

pass a breach of that duty was reasonably foreseeable because it was based on the ordinary tools of statutory construction.

After we heard oral argument in this case, the United States Supreme Court decided *Rogers* v. *Tennessee*, 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001). In *Rogers*, the Supreme Court reaffirmed the principle, previously articulated in *Bouie*, that "a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." (Internal quotation marks omitted.) Id., 462. *Rogers* involved a claim that the Tennessee Supreme Court's retroactive application of its decision abolishing the "year and a day rule"[7] violated the defendant's due process rights under the fourteenth amendment. Id., 453.

In *Rogers*, the petitioner was convicted of second degree murder. Id., 454. According to the undisputed facts, the petitioner had stabbed his victim on May 6, 1994, wounding the victim's heart. Id. The victim died on August 7, 1995. Id. The county medical examiner testified that the victim's death "was caused by cerebral hypoxia secondary to a stab wound to the heart." (Internal quotation marks omitted.) Id. On the basis of those facts, the jury found the petitioner guilty under Tennessee's criminal homicide statute.[8] Id. The petitioner then

---

[7] "At common law, the year and a day rule provided that no defendant could be convicted of murder unless his victim had died by the defendant's act within a year and a day of the act." *Rogers* v. *Tennessee*, supra, 532 U.S. 454.

[8] Tennessee's criminal homicide statute does not mention the common-law year and a day rule. It "defines criminal homicide simply as 'the unlawful killing of another person which may be first degree murder, second degree murder, voluntary manslaughter, criminally negligent homicide or vehicular homicide.' Tenn. Code Ann. § 39-13-201 (1997)." *Rogers* v. *Tennessee*, supra, 532 U.S. 454.

appealed from his conviction, arguing that Tennessee's common-law year and a day rule precluded his conviction. Id. The Supreme Court of Tennessee affirmed the petitioner's conviction, concluding that the original reasons for recognizing the year and a day rule no longer existed. The court therefore abolished the rule. Id., 455.

In affirming the petitioner's conviction, the United States Supreme Court concluded that "[t]here is, in short, nothing to indicate that the Tennessee court's abolition of the rule in [the] petitioner's case represented an exercise of the sort of unfair and arbitrary judicial action against which the Due Process Clause aims to protect. Far from a marked and unpredictable departure from prior precedent, the court's decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense. It did so by laying to rest an archaic and outdated rule that had never been relied upon as a ground of decision in any reported Tennessee case." Id., 466–67. The Supreme Court in *Rogers* reiterated that *Bouie* "restricted due process limitations on the retroactive application of judicial interpretations of criminal statutes to those that are 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' " Id., 461, quoting *Bouie* v. *Columbia*, supra, 378 U.S. 354.

The United States Supreme Court's recent affirmation of the fair warning principles of *Bouie* is in accordance with our fair warning jurisprudence. We consistently have held that "[w]hile we also recognize that criminal statutes are to be construed strictly, the language in a criminal statute need not be given its narrowest possible construction." *State* v. *Colon*, 230 Conn. 24, 32, 644 A.2d 877 (1994). "A statute is not unconstitutional merely because a person must inquire further as to the precise reach of its prohibitions." *State* v. *DeFrancesco*, 235 Conn. 426, 443, 668 A.2d 348 (1995). "In construing the

meaning of terms within a statute we look to General Statutes § 1-1, entitled '[w]ords and phrases,' which provides in subsection (a) that '[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly.' " *State* v. *Wilchinski*, 242 Conn. 211, 223–24, 700 A.2d 1 (1997). In addition, "[r]eferences to judicial opinions involving the statute, the common law, legal dictionaries, or treatises may be necessary to ascertain a statute's meaning to determine if it gives fair warning." *State* v. *Pickering*, 180 Conn. 54, 62–63, 428 A.2d 322 (1980), citing *Rose* v. *Locke*, supra, 423 U.S. 49–50. "In addition, we can use as a guide judicial opinions that, while not binding on this court, refer to the statute in question or to a statute that uses similar language." *State* v. *DeFrancesco*, supra, 444.

With this legal framework in mind, we consider the state's claim that this court's application of § 53a-59 (a) (3) in *State* v. *Miranda*, supra, 245 Conn. 209, was reasonably foreseeable. In recognizing a common-law duty to act under the facts of this case and construing § 53a-59 (a) (3) to encompass the defendant's failure to act, we employed the ordinary tools of statutory construction. We examined the plain language of § 53a-59 (a) (3), the text of our statutes, the common law of our state and other jurisdictions, other Connecticut statutes governing similar conduct, and treatises addressing this issue. These ordinary tools of statutory construction enabled us to conclude that "under the facts of this case, it is appropriate to recognize an affirmative duty to act and to impose criminal liability for the failure to act pursuant to that duty." Id., 221.

First, the court examined the plain language of § 53a-59 (a) (3) and the text of our statutes. We determined

that "the plain language of § 53a-59 (a) (3) [does not] preclude criminal liability from attaching to an omission to act when a legal duty to act exists and injury results." Id., 220–21. In addition, "many statutes that expressly impose a legal duty to act and attach liability for failure to comply with that duty" and other statutes impose liability for failure to comply with a duty found either in a separate statute or in the common law. Id., 219. We also concluded that our Penal Code did not foreclose the possibility of a duty and criminal liability for the breach of that duty existing under the facts of this case. Id., 219–20. We concluded that the text of § 53a-59 (a) (3) and other statutes did not prevent us from recognizing that, under the facts of this case, the defendant had a common-law duty to act and his failure to do so exposed him to criminal liability under § 53a-59 (a) (3). Id., 220–21.

Second, we examined the common law in Connecticut and other jurisdictions. "Common law courts frequently look to the decisions of other jurisdictions in determining whether to alter or modify a common law rule in light of changed circumstances, increased knowledge, and general logic and experience." *Rogers* v. *Tennessee*, supra, 532 U.S. 464. In addition, although due process does not require that a person know the common law of every jurisdiction, an examination of the common law of other jurisdictions "is surely relevant to whether [a change in common law] . . . in a particular case can be said to be unexpected and indefensible by reference to the law as it then existed." Id. We concluded that "[i]t is undisputed that parents have a duty to provide food, shelter and medical aid for their children and to protect them from harm" under the common law of Connecticut and other jurisdictions. *State* v. *Miranda*, supra, 245 Conn. 222. In looking at the common law of other jurisdictions, we also found that some jurisdictions have imposed a duty to protect

a child from harm on adult individuals, other than parents, who establish familial relationships and assume responsibility for the care of a child. Id., 223.

We analyzed four cases from other jurisdictions[9] with facts similar to the present case. In examining those cases, we deduced that "these courts [in other jurisdictions] have examined the nature of the relationship of the defendant to the victim and whether the defendant, as part of that relationship, had assumed a responsibility for the victim" to determine whether the defendant had a duty to act under the particular circumstances of each case. Id. We found "the reliance by these courts on this combination of factors persuasive." Id. Using this same combination of factors, we determined in the present case that "when the defendant, who considered himself the victim's parent, established a familial relationship with the victim's mother and her children and assumed the role of a father, he assumed, under the common law, the same legal duty to protect the victim from the abuse as if he were, in fact, the victim's guardian." Id., 226. An examination of the common law of other states indicated that it was not unexpected and indefensible to impose a common-law duty on the defendant to protect the victim under the facts of this case. See *Rogers* v. *Tennessee*, supra, 532 U.S. 464.

Third, we examined other Connecticut statutes governing conduct similar to that at issue in the present case. We looked "to other relevant statutes governing the same or similar subject matter because the legislature is presumed to have created a consistent body of law." *State* v. *Miranda*, supra, 245 Conn. 229, citing *Daly* v. *DelPonte*, 225 Conn. 499, 510, 624 A.2d 876 (1993). We concluded, therefore, that "because § 53-21

[9] *Leet* v. *State*, 595 So. 2d 959 (Fla. App. 1991); *State* v. *Orosco*, 113 N.M. 789, 833 P.2d 1155 (1991); *People* v. *Wong*, 182 App. Div. 2d 98, 588 N.Y.S.2d 119, rev'd on other grounds, 81 N.Y.2d 600, 619 N.E.2d 600, 601 N.Y.S.2d 440 (1993); *People* v. *Salley*, 153 App. Div. 2d 704, 544 N.Y.S.2d 680 (1989).

[the risk of injury statute], without any explicit restriction, holds responsible *any* person who permits abuse of a child to occur, to prescribe a duty in connection with § 53a-59 (a) (3) to prevent such abuse furthers a harmonious and consistent body of law . . . ." (Emphasis in original; internal quotation marks omitted.) *State v. Miranda*, supra, 245 Conn. 230.

We also reviewed treatises, which demonstrated that the "trend of Anglo-American law has been toward enlarging the scope of criminal liability for failure to act in those situations in which the common law or statutes have imposed an affirmative responsibility for the safety and well-being of others." Id., 215, citing 1 W. LaFave & A. Scott, Substantive Criminal Law (1986) § 3.3; annot., 61 A.L.R.3d 1207 (1975); annot., 100 A.L.R.2d 483 (1965). As Professors LaFave and Scott stated in their treatise, "if two people, though not closely related, live together under one roof, one may have a duty to act to aid the other who becomes helpless." 1 W. LaFave & A. Scott, supra, § 3.3 (a), p. 286.

We conclude that our recognition of a common-law duty that required the defendant either to take affirmative action to prevent harm to the victim or be exposed to criminal liability under § 53a-59 (a) (3) was not " 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.' " *Rogers* v. *Tennessee*, supra, 532 U.S. 461, quoting *Bowie* v. *Columbia*, supra, 378 U.S. 354. To reach the conclusion that we did, we relied on ordinary tools of statutory construction. Those tools of statutory construction demonstrated that by reference to the law as it then existed, it was neither unexpected nor indefensible to impose a common-law duty on the defendant to protect the victim under the facts of this case and to impose criminal liability for his failure to so act. We therefore agree with the state that this court's recognition of a common-law duty and the application of § 53a-

59 (a) (3) were reasonably foreseeable and did not deprive the defendant of due process in accordance with the standard articulated in *Bowie.*

## II

The defendant claims in his cross appeal that the evidence presented at trial was insufficient to support his conviction of assault in the first degree in violation of § 53a-59 (a) (3) and risk of injury to a child in violation of § 53-21. We disagree.

"In reviewing a sufficiency of the evidence claim, we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [trier of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . In evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Wilcox,* 254 Conn. 441, 463, 758 A.2d 824 (2000). "In a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony." *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 153, 527 A.2d 679 (1987). "[W]e must defer to the [trial judge's] assessment of the credibility of the witnesses based on [his] firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the [trial court] if there is sufficient evidence to support the [trial court's] verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Wilcox,* supra, 464. "This court does not retry the case or evalu-

ate the credibility of the witnesses. The resolution of conflicting testimony is the province of the [trial court]." *State* v. *Amarillo*, 198 Conn. 285, 289, 503 A.2d 146 (1986).

A

The defendant first claims that the evidence was insufficient to convict him of assault in the first degree. Specifically, the defendant contends that the state failed to prove that: (1) the victim's mother had abused the child; (2) the defendant actually had been aware of and consciously disregarded the mother's abuse of the victim; (3) the defendant had a parental relationship with the victim; (4) the defendant had the ability to prevent the abuse; and (5) the defendant's failure to provide medical treatment adversely affected the victim's health. We disagree.

First, the defendant contends that proof that the mother abused the victim is an essential element of assault by omission under § 53a-59 (a) (3). The defendant argues that we defined his duty very narrowly in *State* v. *Miranda,* supra, 245 Conn. 209, as the duty to prevent *parental* abuse to a child of the household, therefore, making proof of abuse by a parent an essential element in assault by omission. The defendant contends that we defined his duty in this case as preventing parental abuse when we stated that "there existed a common-law duty to protect the victim from her mother's abuse, the breach of which can be the basis of a conviction under § 53a-59 (a) (3)." Id., 218. The state argues that proof that the mother inflicted the victim's injuries is not an essential element of assault by omission under § 53a-59 (a) (3).

A person is guilty of assault in the first degree under § 53a-59 (a) (3), if, "under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to

another person, and thereby causes serious physical injury to another person . . . ." We determined that, "under the facts of this case, it is appropriate to recognize an affirmative duty to act and to impose criminal liability for the failure to act pursuant to that duty." *State* v. *Miranda*, supra, 245 Conn. 221. In doing so, we concluded that "based upon the trial court's findings that the defendant had established a familial relationship with the victim's mother and her two children, had assumed responsibility for the welfare of the children, and had taken care of them as though he were their father, the defendant had a legal duty to protect the victim from abuse." Id., 212. Nothing in our previous decision should be read as imposing upon the state the additional burden of proving that the mother caused the abuse to the victim. The state's alleged failure to introduce sufficient evidence to prove that the mother had caused the victim's abuse therefore does not mean that there was insufficient evidence on which to convict the defendant under § 53a-59 (a) (3).

The defendant next asserts that the state failed to introduce sufficient evidence to prove that the defendant actually had been aware of and consciously disregarded the mother's abuse of the victim. We are persuaded that the evidence was sufficient to support the trial court's finding that the defendant was actually aware of and consciously disregarded the abuse.

At trial, the defendant admitted that he knew that the victim's mother had not been treating her properly. The defendant acknowledged that he had seen bumps, bruises and lumps on the victim on at least three separate occasions. He also testified that he "would see [the victim] with those bruises on her head . . . [a]nd [he] would get mad [at the victim's mother]." In his testimony, the defendant acknowledged that he had realized that the victim was in need of medical attention. In addition, the trial court's finding that the defendant had

been aware of and consciously disregarded the victim's abuse was supported by the testimony of the state's medical expert, Timothy W. Kelly, who testified that the victim's injuries had occurred over a period of approximately two to three weeks. Kelly testified that the victim's injuries would have resulted in her crying and screaming, perhaps inconsolably at times. He also testified that the victim's injuries would have resulted in physical deformities such as swelling, bruising and poor mobility. Kelly further testified that the physical deformities resulting from the victim's injuries would have been noticeable to someone living with her. In light of both the defendant's own testimony that he had seen the victim's bruises and Kelly's testimony indicating the prevalence and noticeable nature of the victim's injuries, the trial court reasonably could have found that the defendant actually was aware of the victim's injuries and consciously disregarded them.

The defendant also contends that the evidence was insufficient to convict him of assault in the first degree because the state did not prove that he had a parental relationship with the victim. We disagree. The defendant's legal duty under the facts of this case already was decided by this court in the previous appeal. We determined "that, based on the trial court's findings that the defendant had established a family-like relationship with the mother and her two children, that he had voluntarily assumed responsibility for the care and welfare of both children, and that he had considered himself the victim's stepfather, there existed a common-law duty to protect the victim from her mother's abuse . . . ." *State* v. *Miranda*, supra, 245 Conn. 217–18. Although we remanded this case to the Appellate Court to consider the defendant's claim that there was insufficient evidence to convict him of assault in the first degree, our remand did not permit the defendant to reopen the question of whether he had a legal duty to

protect the victim despite the fact that he was not her parent. See id., 214 n.7, 231–32 n.25. That issue already was resolved by this court. See id., 217–18.

The defendant also claims that the state failed to present sufficient evidence to show that he had the ability to prevent the abuse. Specifically, the defendant argues that the state presented no evidence that: (1) he was aware that he could have reported the abuse to authorities; (2) such a report would have prevented the abuse; and (3) he had the legal authority to remove the victim from the home without facing criminal charges for doing so. We find no merit to these claims.

At trial, Kelly testified that the injuries to the victim had occurred over a two to three week time period. The defendant testified that during this time period, he had seen bumps and bruises on the victim, knew that the victim's mother had not been treating her properly, and had told the victim's mother to take her to the hospital. The defendant also testified that he knew that the victim's mother was not providing the child with proper medical treatment for her injuries. With regard to his ability to obtain help, the defendant testified that he frequently would leave the home to look for jobs and visit friends. We note that, on the night the victim was finally taken to the hospital, the defendant did leave the home to use the telephone in the store beneath their apartment to summon emergency medical treatment. On the basis of this evidence, we conclude that the trial court reasonably could have determined that during the two to three week time period during which the victim sustained her injuries, the defendant had the ability and the opportunity to leave the home to report the abuse or to seek medical treatment for the victim.

The defendant's final claim is that the state failed to introduce sufficient evidence to show that his failure to provide medical treatment for the victim adversely

affected the victim's health. Specifically, the defendant contends that the state did not present any evidence that either the skull fractures or the rectal tear were exacerbated by the lack of prompt medical treatment. We disagree.

The state introduced evidence showing that there were at least three instances of abuse. Kelly testified that the physical examination of the victim revealed that the injuries occurred in the following order: first, the rib fractures, then the skull fractures, and, finally, the rectal tear and bruising to the leg. Kelly further testified that the rib fractures would have resulted in bruising, swelling and poor mobility. The defendant's failure to act after the rib fractures allowed the victim to be subjected to the second instance of abuse, which resulted in the skull fractures. Kelly testified that these skull fractures most likely would have produced noticeable swelling, bruising of the skull, inconsolable crying, a soft spot on the skull, and a change in the victim's ability to eat. The defendant testified that he had seen the bumps and bruises on the victim's head. The defendant's failure to act after the skull fractures allowed the victim to be subjected to a third instance of abuse, which resulted in the rectal tear and the bruising to the leg. The evidence was sufficient for the trial court to have found that the defendant's failure to act led to further instances of abuse of the victim. We conclude, therefore, that the trial court reasonably could have found that had the defendant sought medical treatment for the victim or reported the victim's abuse when he initially became aware of the abuse, the victim would not have been subjected to additional injuries.

## B

The defendant also claims that the state failed to produce sufficient evidence to support his conviction for risk of injury to a child, pursuant to § 53-21. Specifi-

cally, the defendant claims that the state failed to prove that: (1) he caused or permitted a situation to exist in which the life or limb of the victim was endangered; and (2) that he acted with specific intent. We disagree.

The defendant argues that the state failed to produce sufficient evidence to show that he caused or permitted a situation to exist in which the life or limb of the victim was endangered. We conclude that there was sufficient evidence for the trial court reasonably to have found that the defendant failed to act to prevent the victim's abuse in violation of § 53-21. At trial, Kelly testified that: (1) the victim "is an example of a textbook case of battered child syndrome"; (2) many of the victim's injuries were life-threatening; and (3) the victim's injuries could not have been inflicted accidentally and were inconsistent with the explanations offered by the defendant. Kelly also testified that as a result of the injuries the victim sustained during this two to three week period, she was likely to suffer long-term effects, including loss of I.Q., mental retardation, seizures, and attention deficit disorder. In addition, the defendant testified that he had been aware of the victim's injuries, knew that the victim's mother did not treat her properly, and knew that the victim was not receiving the medical care he thought was appropriate. Viewed in the light most favorable to sustaining the verdict, the evidence was sufficient to establish that the defendant's failure to act to prevent the abuse from continuing endangered the victim's life or limb in violation of § 53-21.

The defendant also asserts that the evidence was insufficient to support his conviction for risk of injury to a child because the state failed to prove that he acted with "specific intent." Specifically, the defendant contends that a conviction under § 53-21 requires the state to prove specific intent. We disagree. The defendant was charged and convicted under the revision of the risk of injury statute in existence at the time of the

offenses, which provides in relevant part that "[a]ny person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired . . . shall be fined not more than five hundred dollars or imprisoned not more than ten years or both." General Statutes (Rev. to 1991) § 53-21; see footnote 3 of this opinion.

It is well settled that we have construed § 53-21 "to proscribe two general types of behavior likely to injure physically or to impair the morals of a minor under sixteen years of age: (1) deliberate indifference to, acquiescence in, or the creation of situations inimical to the minor's moral or physical welfare . . . and (2) acts directly perpetrated on the person of the minor and injurious to his moral or physical well-being." (Citation omitted.) *State* v. *Dennis*, 150 Conn. 245, 250, 188 A.2d 65 (1963). "[T]he first part of § 53-21 prohibits the wilful creation of a 'situation' likely to impair the health of a child and thus encompasses the protection of the body as well as the safety and security of the environment in which the child exists, and for which the adult is responsible. . . . The plain language of the first part of § 53-21 indicates the legislature's understanding that there is a broad class of intentional conduct that can put a child's well-being seriously at risk without any physical contact by the perpetrator." (Citation omitted.) *State* v. *Payne*, 240 Conn. 766, 774, 695 A.2d 525 (1997). "[A] failure to act when one is under a duty to do so, thereby permitting such a dangerous situation to exist, may be sufficient to support a conviction under this statute." *State* v. *Dumlao*, 3 Conn. App. 607, 614, 491 A.2d 404 (1985). As set forth in part II A of this opinion, the state introduced sufficient evidence at trial to show that the defendant was aware of the victim's abuse and that his failure to act permitted the child to remain in the home and be subjected to additional abuse. We

conclude, therefore, that the trial court reasonably could have determined that the defendant had the intent required to support a conviction under the first prong of § 53-21.

### III

We next address the defendant's claims that his conviction of two counts of assault in the first degree in violation of § 53a-59 (a) (3) and one count of risk of injury to a child in violation of § 53-21 violate the federal constitutional prohibition against double jeopardy. Specifically, the defendant claims that: (1) his conviction of two counts of assault in the first degree violates the prohibition against double jeopardy because they constitute one act of omission; and (2) his conviction of both assault in the first degree and risk of injury to a child violate the prohibition against double jeopardy because risk of injury to a child is a lesser included offense of assault in the first degree.[10]

"The double jeopardy clause of the fifth amendment to the United States constitution provides: '[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . .' The double jeopardy clause is applicable to the states through the due

---

[10] The dissenting and concurring opinion argues that the constitutional protection against double jeopardy prohibits us from affirming the defendant's conviction on counts five and ten of the information because the defendant was found not guilty on counts one and six. Specifically, the dissenting and concurring opinion suggests that once the defendant had been acquitted on charges of reckless conduct for failing to prevent further abuse of the victim, he could not be convicted lawfully of first degree assault, which charge was predicated on the same conduct. See part I of the dissenting and concurring opinion. We disagree. First, the defendant has not raised this claim but, instead, has limited his double jeopardy argument to the two claims addressed herein. Second, we do not read any of the three cases cited in the dissenting and concurring opinion; see *Sanabria* v. *United States*, 437 U.S. 54, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978); *Benton* v. *Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *Ball* v. *United States*, 163 U.S. 662, 16 S. Ct. 1192, 41 L. Ed. 300 (1896); as providing direct support for the conclusion urged in that opinion.

process clause of the fourteenth amendment. See *Benton* v. *Maryland*, 395 U.S. 784, 794, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969). 'Although the Connecticut constitution has no specific double jeopardy provision, we have held that the due process guarantees of article first, § 9, include protection against double jeopardy. *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).' *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991); see also *State* v. *Nixon*, 231 Conn. 545, 550, 651 A.2d 1264 (1995) (right to protection against double jeopardy is implicit in due process guarantees of state constitution)." *State* v. *Crawford*, 257 Conn. 769, 774, 778 A.2d 947 (2001).

"We have recognized that the Double Jeopardy Clause consists of several protections: It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense. *North Carolina* v. *Pearce*, 395 U.S. 711, 717 [89 S. Ct. 2072, 23 L. Ed. 2d 656] (1969) . . . . These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense. *United States* v. *Wilson*, 420 U.S. 332, 339 [95 S. Ct. 1013, 43 L. Ed. 2d 232] (1975). The Clause operates as a bar against repeated attempts to convict, with consequent subjection of the defendant to embarrassment, expense, anxiety, and insecurity, and the possibility that he may be found guilty even though innocent. *United States* v. *DiFrancesco*, 449 U.S. 117, 136 [101 S. Ct. 426, 66 L. Ed. 2d 328] (1980)." (Internal quotation marks omitted.) *Schiro* v. *Farley*, 510 U.S. 222, 229–30, 114 S. Ct. 783, 127 L. Ed. 2d 47 (1994).

## A

We first address the defendant's claim that his conviction of two counts under § 53a-59 (a) (3) for assault in the first degree violated the federal constitutional prohibition against double jeopardy. Specifically, the defendant argues that his two convictions of assault in the first degree constitute multiple punishments for the same offense because they are based on one act, namely, his ongoing failure to protect the victim from harm. We conclude that his convictions do not violate the prohibition against double jeopardy because each conviction arises from a separate act of omission.

"Double jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, however closely they may follow each other . . . may be punished as separate crimes without offending the double jeopardy clause. . . . The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. . . . [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]." (Citations omitted; internal quotation marks omitted.) *State* v. *Tweedy*, 219 Conn. 489, 497–98, 594 A.2d 906 (1991).

"The proper double jeopardy inquiry when a defendant is convicted of multiple violations of the same statutory provision is whether the legislature intended to punish the individual acts separately or to punish only the course of action which they constitute." (Internal quotation marks omitted.) *State* v. *Garvin*, 242 Conn. 296, 304, 699 A.2d 921 (1997). "The defendant on appeal bears the burden of proving that the prosecutions are

for the same offense in law and fact." *State* v. *Snook*, 210 Conn. 244, 264, 555 A.2d 390, cert. denied, 492 U.S. 924, 109 S. Ct. 3258, 106 L. Ed. 2d 603 (1989).

The defendant was convicted of two counts of assault in the first degree in violation of § 53a-59 (a) (3),[11] based upon the fifth[12] and tenth[13] counts of the long form information. In the fifth count, the state alleged that the defendant had "on diverse dates and times between October, 1992, and January 27, 1993 . . . engage[d] in conduct which created a risk of death to . . . [the victim], and thereby caused serious physical injury to such person, to wit: multiple skull fractures . . . ." In the tenth count, the state alleged that the defendant had "on diverse dates and times between October, 1992, and January 27, 1993 . . . engage[d] in conduct which created a risk of death to . . . [the victim], and thereby caused serious physical injury to such person, to wit: a rectal laceration . . . ."

---

[11] Because the state concedes that the defendant's assault convictions rested on two separate acts of omission, which led to two, rather than six, discrete injuries, we address only these two convictions of assault in the first degree. See footnote 1 of this opinion.

[12] The fifth count of the long form information alleged: "The Assistant State's Attorney aforesaid further accuses Santos Miranda of Assault, First Degree, and charges that in the City of Meriden on diverse dates and times between October, 1992, and January 27, 1993, the said Santos Miranda, under circumstances evincing an extreme indifference to human life did recklessly engage in conduct which created a risk of death to another person, to wit: [the victim], and thereby caused serious physical injury to such person, to wit: multiple skull fractures, said conduct being in violation of Section 53a-59 (a) (3) of the Connecticut General Statutes."

[13] The tenth count of the long form information alleged: "The Assistant State's Attorney aforesaid further accuses Santos Miranda of Assault, First Degree, and charges that in the City of Meriden on diverse dates and times between October, 1992, and January 27, 1993, [the said Santos Miranda] under circumstances evincing an extreme indifference to human life, did recklessly engage in conduct which created a risk of death to another person, to wit: [the victim], and thereby caused serious physical injury to such person, to wit: a rectal laceration, said conduct being in violation of Section 53a-59 (a) (3) of the Connecticut General Statutes."

The defendant first claims that because counts five and ten of the information charged him with committing the crimes on "diverse dates and times between October, 1992, and January 27, 1993," that the state is alleging a continuous omission, rather than two distinct acts of omission. In support of his argument, the defendant cites *State* v. *Snook*, supra, 210 Conn. 244, for the proposition that it is necessary for the charging documents to indicate separate dates or times for the charges in order to constitute separate offenses for double jeopardy purposes. In *Snook*, however, this court concluded that "[t]he failure of the state to obtain more specific information as to the date or dates of the acts alleged in count two did not render the defendant's criminal conduct 'a violation of law continuous in nature.' " Id., 261. The appropriate inquiry, instead, was whether the statute that the defendant was charged with violating prohibited a continuous course of conduct or a distinct act.

"Double jeopardy prohibits multiple punishments for the same offense in the context of a single trial. Nonetheless, distinct repetitions of a prohibited act, however closely they may follow each other; *Blockburger* v. *United States*, [284 U.S. 299, 302, 52 S. Ct. 180, 76 L. Ed. 2d 306 (1932)]; may be punished as separate crimes without offending the double jeopardy clause. *State* v. *Snook*, [supra, 210 Conn. 262]; see *State* v. *Eason*, 192 Conn. 37, 46–47, 470 A.2d 688 (1984); see also *United States* v. *Hawkins*, 794 F.2d 589, 590 (11th Cir. 1986). The same transaction, in other words, may constitute separate and distinct crimes where it is susceptible of separation into parts, each of which in itself constitutes a completed offense. *Robinson* v. *United States*, 143 F.2d 276, 277 (10th Cir. 1944), approved in *Bell* v. *United States*, 349 U.S. 81, 75 S. Ct. 620, 99 L. Ed. 905 (1955). [T]he test is not whether the criminal intent is one and the same and inspiring the whole transaction, but

whether separate acts have been committed with the requisite criminal intent and are such as are made punishable by the [statute]. *Morgan* v. *Devine*, 237 U.S. 632, 640, 35 S. Ct. 712, 59 L. Ed. 1153 (1915); accord *United States* v. *Melton*, 763 F.2d 401, 402 (11th Cir. 1985); *United States* v. *Shaid*, 730 F.2d 225, 226 (5th Cir. 1984)." (Internal quotation marks omitted.) *State* v. *Tweedy*, supra, 219 Conn. 497–98.

In *Tweedy*, this court concluded that two convictions of robbery in violation of General Statutes § 53a-133 did not violate the prohibition against double jeopardy even when the charged offenses both had arisen within thirty minutes and during a "continuous intimidation by a defendant's unceasing forcible conduct . . . ." Id., 497. We concluded that because § 53a-133 defines robbery as, "when, in the course of committing a larceny, the defendant engages in forcible conduct with a proscribed purpose . . . [t]he legislature . . . expressly designated the course of committing a larceny, rather than the course of forcible conduct, as the time frame for completion of the offense of robbery." (Internal quotation marks omitted.) Id., 498–99. We held, therefore, that the defendant "committed two completed and hence separately punishable offenses of robbery as defined by § 53a-133." Id., 499.

Applying this analysis to the facts of the present case, we conclude that the defendant has failed to meet his burden of proving that his conviction of assault with regard to the skull fractures and his conviction of assault with regard to the rectal tear arose out of the same act. Section 53a-59 (a) provides in relevant part that "[a] person is guilty of assault in the first degree when . . . (3) under circumstances evincing an extreme indifference to human life he recklessly engages in conduct which creates a risk of death to another person, and thereby causes serious physical injury to another person . . . ." In our previous deci-

sion in this case, we concluded that "[f]ailure to act when there is a special relationship does not, by itself, constitute a crime. The failure must expose the dependent person to some proscribed result." (Internal quotation marks omitted.) *State* v. *Miranda*, supra, 245 Conn. 220. We further determined that § 53a-59 (a) (3) does not "preclude criminal liability from attaching to an omission to act when a legal duty to act exists and injury results." Id., 220–21. It follows logically that each act of omission that results in a separate injury constitutes a separate offense of assault.

We conclude that each of the defendant's failures to act to prevent harm that resulted in a distinct, serious physical injury to the victim constitutes a separate violation of § 53a-59 (a) (3). According to Kelly, at the time he examined the victim, her injuries were at various stages in healing, indicating that there were at least three instances of abuse. He testified that the skull fractures were approximately one week to ten days old and that the rectal tear was a fresh injury, inflicted immediately prior to her hospital admission. The defendant's failure to act after the first instance of abuse exposed the victim to the second instance, during which the victim suffered the skull fractures. The defendant's failure to act after the second instance of abuse exposed the victim to the third instance, during which she suffered the rectal tear. Contrary to the defendant's assertions, his failure to act does not constitute one ongoing omission, but instead constituted two separate omissions, each of which resulted in a separate, serious physical injury to the victim, namely the skull fractures and the rectal tear. Accordingly, the defendant's two convictions for a violation of § 53a-59 (a) (3) did not violate the constitutional prohibition against double jeopardy.

## B

The defendant also contends that his conviction of assault in the first degree and risk of injury to a child violate the federal constitutional prohibition against double jeopardy. Specifically, the defendant asserts that risk of injury to a child is a lesser included offense of assault in the first degree by omission and that, therefore, they are the same offense for double jeopardy purposes. We disagree.

"In accordance with *Blockburger* v. *United States*, [supra, 284 U.S. 304], double jeopardy claims challenging the constitutional validity of convictions pursuant to two distinct statutory provisions are traditionally analyzed by inquiring whether each provision requires proof of a fact of which the other does not require proof." *State* v. *Garvin*, supra, 242 Conn. 304. "It is clear . . . that if the two counts stand in the relationship of greater and lesser included offense, then [t]he greater offense is . . . by definition the same for purposes of double jeopardy as any lesser offense included in it." (Citation omitted; internal quotation marks omitted.) *State* v. *Goldson*, 178 Conn. 422, 425, 423 A.2d 114 (1979). "The test for determining whether one violation is a lesser included offense in another violation is whether it is possible to commit the greater offense, in the manner described in the information or bill of particulars, without having first committed the lesser. If it is possible, then the lesser violation is not an included crime." (Internal quotation marks omitted.) Id., 426. "In conducting this inquiry, we look only to the relevant statutes, the information, and the bill of particulars, not to the evidence presented at trial." (Internal quotation marks omitted.) *State* v. *Greco*, 216 Conn. 282, 291, 579 A.2d 84 (1990).

Application of the *Blockburger* test to the facts of this case leads us to conclude that risk of injury to a

child is not a lesser included offense of assault in the first degree, as they are charged in this case. In counts five and ten of the information, the state charged the defendant with assault in the first degree in violation of § 53a-59 (a) (3). Section 53a-59 (a) (3) requires that the state prove that, under circumstances evincing an extreme indifference to human life, the defendant recklessly engaged in conduct which created a risk of death to another person, and thereby caused serious physical injury. In count twenty-six of the information, the state charged the defendant with risk of injury in violation of § 53-21. Section 53-21 requires the state to prove that the defendant wilfully or unlawfully caused or permitted a child under the age of sixteen to be placed in such a situation that its life or limb was endangered, or its health was likely to be injured.

As charged in the present case, assault in the first degree requires proof of the following elements that are *not* required to prove risk of injury: (1) the defendant recklessly engaged in conduct; and (2) that conduct caused serious physical injury to the victim. Risk of injury requires proof of the following elements that are *not* required to prove assault in the first degree: (1) the defendant wilfully or unlawfully caused or permitted the victim to be placed in such a situation that the victim's life or limb is endangered, or the health of the victim is likely to be injured; and (2) the victim is a child under sixteen years old. Assault in the first degree and risk of injury both require proof of elements that the other does not. Consequently, it is *possible* to prove one offense in the manner charged in the information without necessarily proving the other offense. We conclude, therefore, that assault in the first degree and risk of injury do not stand in relationship to each other as greater and lesser offenses, and that they are separate and distinct offenses for double jeopardy purposes.

The defendant further claims that the defendant's conviction of assault in the first degree in violation of § 53a-59 (a) (3) and risk of injury to a child in violation of § 53-21 should be treated as the same offense for double jeopardy purposes, even if they constitute separate offenses under the *Blockburger* test. "The *Blockburger* test is a rule of statutory construction, and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." (Internal quotation marks omitted.) *State* v. *Greco*, supra, 216 Conn. 293. The defendant, however, has provided no authority for his claim that there is a clear legislative intent that § 53a-59 (a) (3) and § 53-21 be treated as the same offense for double jeopardy purposes. As "[t]he defendant on appeal bears the burden of proving that the prosecutions are for the same offense in law and fact"; *State* v. *Snook*, supra, 210 Conn. 264; we conclude that § 53a-59 (a) (3) and § 53-21 are not the same offense for double jeopardy purposes.

## IV

As a result of our decision today, we remand this case to the Appellate Court with direction to affirm the trial court's judgment of guilty only as to two counts of assault in the first degree and one count of risk of injury to a child as charged in counts five, ten and twenty-six of the long form information, respectively. After oral argument of this appeal, we ordered the parties to file supplemental briefs to address whether the trial court could resentence the defendant on those counts if we were to reverse the judgment of the Appellate Court. Specifically, we ordered the parties to address the following issues: (1) whether the trial court is bound by the previously imposed sentences on counts five, ten and twenty-six; (2) whether the trial court may resentence the defendant under the principles of *State* v. *Raucci*, 21 Conn. App. 557, 575 A.2d 234, cert. denied,

215 Conn. 817, 576 A.2d 546 (1990); and (3) what would be the resulting sentence or range of sentences.[14]

The defendant originally was "committed to the commissioner of correction as follows: Each of counts 2 and 3 a term of fifteen (15) years; count 5 a term of fifteen (15) years to run concurrent to counts 2 and 3; count 7 a term of fifteen (15) years, to run consecutive to counts 2, 3, and 5; count 8 a term of fifteen (15) years, to run concurrent with count 7; count 10 a term of fifteen (15) years, to run concurrent with counts 7 and 8; count 26 a term of ten (10) years to run consecutive to counts 2, 3, 5, 7, 8, 10. Total effective sentence: Forty (40) years."

## A

The defendant argues that the trial court can resentence the defendant on counts five, ten and twenty-six to a term somewhere between one to forty years. Specifically, the defendant contends that under the principles of *Raucci,* the trial court has the authority to impose a new sentence on counts five, ten and twenty-six, as long as the new sentence does not exceed the length of the original sentence. The state agrees that the defendant can be resentenced under the principles of *Raucci.* The state, however, asserts that the trial court can do only one of the following: (1) it may reimpose the consecutive fifteen year prison terms on the two surviving assault counts in accordance with the

[14] Our order for supplemental briefing provided as follows: "If this court reverses the Appellate Court and remands the case to the Appellate Court with instructions to reinstate the defendant's convictions on some counts of the information and to remand to the trial court with instructions to vacate the defendant's convictions and sentences on other counts; see footnote 8, pp. 9–10 of the state's brief: (1) is the trial court bound by the previously imposed sentences on the remaining counts? (2) may the court resentence the defendant under the principles of *State* v. *Raucci,* [supra, 21 Conn. App. 557]? (3) in either event, what would be the resulting sentence or range of sentences?"

original sentencing package; or (2) it may impose a shorter term of imprisonment on the two surviving assault counts if the court deems such action necessary to effectuate its original intent. We agree with the defendant.

In *State* v. *Raucci*, supra, 21 Conn. App. 563, the Appellate Court adopted the "aggregate package" theory of sentencing. In doing so, the Appellate Court recognized that the overwhelming weight of federal authority recognizes that "the defendant, in appealing his conviction and punishment, has voluntarily called into play the validity of the entire sentencing package, and, thus, the proper remedy is to vacate it in its entirety. More significantly, the original sentencing court is viewed as having imposed individual sentences merely as component parts or building blocks of a larger total punishment for the aggregate convictions, and, thus, to invalidate any part of that package without allowing the court thereafter to review and revise the remaining valid convictions would frustrate the court's sentencing intent." Id., 562. Accordingly, the Appellate Court concluded that "the [resentencing] court's power under these circumstances is limited by its original sentencing intent as expressed by the original total effective sentence, and, furthermore, that this power is permissive, not mandatory. Although the court may reconstruct the sentencing package to conform to its original intent, it is not required to do so. It may, therefore, simply eliminate the sentence previously imposed for the vacated conviction, and leave the other sentences intact; or it may reconstruct the sentencing package so as to reach a total effective sentence that is less than the original sentence but more than that effected by the simple elimination of the sentence for the vacated conviction. The guiding principle is that the court may resentence the defendant 'to achieve a rational, coherent [sentence] in light of the remaining convictions,' as long as the

revised total effective sentence does not exceed the original." Id., 563, quoting *United States* v. *Bentley*, 850 F.2d 327, 328 (7th Cir.), cert. denied, 488 U.S. 970, 109 S. Ct. 501, 102 L. Ed. 2d 537 (1988).

The state asserts that *Raucci* limits the options of the resentencing court to either: (1) reimpose the consecutive fifteen year prison terms for the two remaining assault charges; or (2) impose a shorter term of imprisonment on the two remaining assault charges, without being able to adjust the sentence on the conviction for risk of injury to a child. We disagree. "It is axiomatic that a trial court has wide discretion to tailor a just sentence in order to fit a particular defendant and his crimes, as long as the final sentence falls within the statutory limits. . . .  This same wide sentencing discretion equally applies to a trial court's restructuring of a sentencing plan for a defendant who has been convicted in a multiple count case and who faces a permissible range of punishment based on the individual counts. [W]hen a defendant is found guilty on a multicount indictment, there is a strong likelihood that the . . . court will craft a disposition in which the sentences on the various counts form part of an overall plan. When the conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture . . . within applicable constitutional and statutory limits, if that appears necessary in order to ensure that the punishment still fits both crime and criminal." (Citations omitted; internal quotation marks omitted.) *State* v. *Raucci*, supra, 21 Conn. App. 563–64. Under the aggregate package view, in the present case, the court may reconstruct the sentence in any way necessary to ensure that the punishment fits both the crime and the defendant, as long as the final sentence does not exceed forty years.

## B

The defendant also claims that General Statutes § 51-183c[15] requires that this case be assigned to another trial judge for resentencing.[16] We disagree.

The defendant's reliance on § 51-183c is misplaced. Section 51-183c applies exclusively to "trials" as distinguished from a sentencing hearing. The defendant asserts that the term trial in § 51-183c includes the sentencing procedure. We are not persuaded.

"In interpreting statutes . . . [w]e presume that laws are enacted in view of existing relevant statutes . . . and that [s]tatutes are to be interpreted with regard to other relevant statutes because the legislature is presumed to have created a consistent body of law." (Internal quotation marks omitted.) *Casey* v. *Northeast Utilities*, 249 Conn. 365, 369–70, 731 A.2d 294 (1999); *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 444, 705 A.2d 1012 (1997). Therefore, "[w]e must, if possible, read the two statutes together and construe each to leave room for the meaningful operation of the other." *State* v. *West*, 192 Conn. 488, 494, 472 A.2d 775 (1984).

In accordance with these guidelines for statutory interpretation, we conclude that a sentencing hearing does not constitute a trial. "The legislature's use of the term 'trial' in . . . § 51-183c, rather than the more general term 'proceeding,' as used in [General Statutes] § 51-183d, must be viewed as intentional in light of the presumption that the legislature is aware of the

---

[15] General Statutes § 51-183c provides: "No judge of any court who tried a case without a jury in which a new trial is granted, or in which the judgment is reversed by the Supreme Court, may again try the case. No judge of any court who presided over any jury trial, either in a civil or criminal case, in which a new trial is granted, may again preside at the trial of the case."

[16] The defendant raised this issue in his supplemental brief. This issue, however, was not specifically requested by our order for supplemental briefs. See footnote 14 of this opinion. The state, therefore, did not address this issue in its supplemental brief.

existence of the rules of practice and other legislation and intended to create a consistent body of law. In order to construe these two statutes as consistent with each other we must accord each term a different meaning." *Lafayette Bank & Trust Co.* v. *Szentkuti*, 27 Conn. App. 15, 20, 603 A.2d 1215, cert. denied, 222 Conn. 901, 606 A.2d 1327 (1992). Practice Book § 44-37 (10) defines trial for the purposes of criminal matters as "that judicial proceeding at which the guilt or innocence of the defendant to the offense or offenses charged is to be determined." In addition, the organization of the rules of procedure in criminal cases; Practice Book chs. 36 through 44; illustrates the legislature's intent to define a sentencing hearing as a separate procedure from the trial. Our rules of practice address "Trial Procedure" in chapter 42 of the Practice Book and separately address sentencing in chapter 43, which is entitled "Sentencing, Judgment, and Appeal." We conclude, therefore, that the legislature did not intend for § 51-183c to apply to a sentencing procedure. This case, therefore, does not have to be assigned to another trial judge for resentencing.

The judgment of the Appellate Court is reversed in part and the case is remanded to that court with direction to affirm the trial court's judgment of guilty as to counts five, ten and twenty-six and to remand the case to the trial court to resentence the defendant on those counts in accordance with this opinion.

In this opinion BORDEN, NORCOTT, KATZ and PALMER, Js., concurred.

PALMER, J., concurring. In *State* v. *Miranda*, 245 Conn. 209, 715 A.2d 680 (1998), I questioned whether the defendant, Santos Miranda, had fair warning that his failure to act in the particular circumstances of that case fell within the purview of General Statutes § 53a-59 (a) (3). *State* v. *Miranda*, supra, 232 (*Palmer, J.,*

concurring). Subsequent to the issuance of our decision in *Miranda* and the issuance of the decision of the Appellate Court in the present case; *State* v. *Miranda*, 56 Conn. App. 298, 742 A.2d 1276 (2000); the United States Supreme Court decided *Rogers* v. *Tennessee*, 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001), which, for the reasons set forth by the majority, resolves the defendant's due process claim against him. Because I also agree with the opinion of the majority in all other respects, I join it.

MCDONALD, C. J., with whom SULLIVAN, J., joins, dissenting in part and concurring in part.[1] The defendant, Santos Miranda, had been charged with twenty-five counts of first degree assault and one count of risk of injury to a child. These offenses were all alleged to have been committed against the same infant on diverse dates between October, 1992, and January 27, 1993. The trial court found the defendant guilty of six counts of first degree assault. Of those, counts two, three and five charged that the defendant had caused the victim's skull fractures, under circumstances evincing an extreme indifference to human life, by recklessly: "allowing" the victim "to live in a situation where she was at repeated risk of injury to her person, which created a risk of death"; "failing to take measures to prevent [the victim] from living in a situation that placed her at risk of repeated injury . . . which created a risk of death"; and engaging in conduct creating a risk of death to the victim. The defendant was also found guilty on counts seven, eight and ten, which repeated the language of counts two, three and five and charged the

---

[1] This is one case where "because of various legitimate factors, decisions of this court have not been rendered until many months after their oral argument, sometimes not until the following court year." *Doyle* v. *Metropolitan Property & Casualty Ins. Co.*, 252 Conn. 912, 914B, 746 A.2d 1257 (1999). Because, as appears at the beginning of this opinion, I participated in this case after reaching mandatory retirement age, it should be noted that this dissent was prepared within 150 days of the opinion it addressed. See id.

defendant with causing the victim to suffer a rectal laceration.

The trial court found the defendant not guilty of nineteen counts of first degree assault. Four of those counts accused the defendant of intentionally inflicting a serious injury by use of a dangerous instrument and five of those counts accused him of not preventing his girlfriend, the victim's mother, "from repeatedly physically injuring" the victim.

Count twenty-six also charged the defendant with a violation of General Statutes (Rev. to 1991) § 53-21, the risk of injury statute. That count charged that the defendant, "under circumstances evincing an extreme indifference to human life," did wilfully or unlawfully cause the victim, a child under sixteen, to be placed in such a situation that her life or limb was endangered or her health was likely to be injured. The trial court found the defendant guilty on that count.

The trial court sentenced the defendant to a term of fifteen years on count two. On count three, the defendant was sentenced to fifteen years to be served "consecutive to the sentence on the second count" and on count five the sentence was fifteen years to be served concurrently to the sentence on count two. The court then stated that the sentences on counts two, three and five were to be concurrent.

The trial court also sentenced the defendant to a term of fifteen years on count seven. A fifteen year term on count eight, to be served concurrently with that imposed on count seven, and a fifteen year term on count ten, to be served concurrently with that on counts seven and eight, were also imposed. The sentences on counts seven, eight and ten were to be served consecutively to the sentences on counts two, three and five. The court also sentenced the defendant on the risk of injury count to ten years to be served consecutively to

the first degree assault sentences. This was stated to be an effective sentence of forty years. As noted by the majority, the mother of the victim was sentenced to a seven year term upon her conviction for intentionally assaulting the victim and for risk of injury.

I

While I concur with the opinion of the majority that there is no merit to the defendant's claims as to his conviction for risk of injury, I dissent from the majority's sustaining of the defendant's convictions for first degree assault.

Counts two, three, seven and eight specified that the defendant either allowed the victim to live in a situation of repeated risk of injury or failed to prevent the victim from living or being in a situation that placed her at risk of repeated injury and death, and thereby caused serious physical injury to the victim. The trial court had found the defendant guilty, because he "failed to act to help or aid [the victim] by promptly notifying authorities of her injuries, taking her for medical care, removing her from her circumstances and *guarding* her from future abuses." (Emphasis added; internal quotation marks omitted.) *State* v. *Miranda*, 245 Conn. 209, 214, 715 A.2d 680 (1998) (*Miranda I*). The gist of the trial court's findings supporting the assault convictions was the defendant's failure to guard against future injury, which resulted in subsequent serious injury. Under this theory, the defendant was liable for those injuries he should have known would be inflicted in the future if he continued to allow the victim to be at risk in her "circumstances."

The evidence at the trial was that the defendant was living with the victim's mother, who was his girlfriend, and her two children in his girlfriend's apartment. In these circumstances, the victim, an infant under the

age of four months, suffered repeatedly inflicted traumatic injuries.

In affirming the defendant's convictions for first degree assault on counts five and ten, the majority relies upon the evidence that the victim was living in a household with her mother and was being battered. It also relies on evidence that the mother did not seek medical aid for her child despite the defendant's urging that she do so. The majority concludes, because the defendant himself did not seek medical care or report the victim's abuse, that the victim subsequently suffered additional violent injury. Since the trial court found that the defendant did not himself inflict those injuries, the defendant's guilt for first degree assault rests upon his failure to guard the victim from another person's repeated assaults.

In *Miranda I*, this court looked to the mother as the person from whose abuse the defendant was required to guard the victim. Id., 218. This court held in *Miranda I* that the defendant owed a duty "to protect the victim from her mother's abuse . . . ." Id.

Under all the first degree assault counts, the state was required to produce evidence to establish that the defendant allowed repeated physical violence to be inflicted on the victim, which caused her injuries. The defendant did not himself batter the victim, and the evidence revealed the victim's mother as the only other person with the opportunity repeatedly to assault the four month old infant.

As the court pointed out in *Miranda I*, the defendant's guilt for reckless assault because of omission depended upon whether he effectively could prevent future abuse. In *Miranda I*, supra, 245 Conn. 227, we stated that the defendant could have sought medical care for the victim "throughout the four month period during which she was abused by her mother . . . ." In this case, the

state could point only to the victim's mother as the one battering the victim, and the defendant could be guilty of reckless assault only if he did not prevent his girlfriend, the mother, from abusing the victim. The trial court, however, found the defendant not guilty of counts one and six of the information charging the defendant with reckless conduct in not preventing the victim's mother from repeatedly assaulting the victim, which resulted in serious injury. Once the trial court acquitted the defendant of that specification, the double jeopardy clause prohibited the affirmance of his conviction for first degree assault on those grounds. See *Sanabria* v. *United States*, 437 U.S. 54, 69, 72–73, 98 S. Ct. 2170, 57 L. Ed. 2d 43 (1978); *Benton* v. *Maryland*, 395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969); *United States* v. *Ball*, 163 U.S. 662, 670, 16 S. Ct. 1192, 41 L. Ed. 300 (1896).

I also dissent on due process grounds. In applying this new rule after the fact, this court "ex post facto" now extends the scope of criminal liability for third party Penal Code crimes beyond the Penal Code provisions and our previous case law. General Statutes § 53a-59 (a) (3), the first degree assault statute under which the defendant was charged, is part of the Connecticut Penal Code, and the Penal Code itself in General Statutes § 53a-8 provides for "[c]riminal liability for [the] acts of another." Section 53a-8 (a) makes one liable for the crimes of another if one "solicits, requests, commands, importunes or intentionally aids another person" in the commission of an offense. Our cases have long and uniformly held that mere presence as an inactive companion, or "passive acquiescence," does not establish criminal liability for the acts of a third party. *State* v. *Hicks*, 169 Conn. 581, 584–85, 363 A.2d 1081 (1975); *State* v. *Laffin*, 155 Conn. 531, 536, 235 A.2d 650 (1967); *State* v. *Purdy*, 147 Conn. 7, 11, 156 A.2d 193 (1959). In this case, the theory of liability was that

the defendant failed to act. The essence of the defendant's criminal conduct was inaction or passive acquiescence. Counts two, three, seven and eight specified that the defendant allowed the victim to be in a situation of risk or failed to prevent the victim from being in such a situation. We have held that such specifications encompass one's "acquiescence" in a situation of risk. See *State* v. *Jason B.*, 248 Conn. 543, 567, 729 A.2d 760, cert. denied, 528 U.S. 967, 120 S. Ct. 406, 145 L. Ed. 2d 316 (1999). Before today this would not support criminal liability for the criminal acts of a third party.

This case now extends criminal liability beyond the traditional boundaries. It creates criminal liability for allowing a "situation" or conditions to exist where some other person may independently decide to cause, and does cause, serious physical injury. That person decided to and did harm the victim, and that decision was the cause in fact of her injuries. Without that person's actions, no such injury would have been inflicted. Section 53a-59 (a) (3) was modeled after § 120.10 (3) of the New York Penal Code. None of the examples of the application of the New York Penal Code definition of such reckless conduct involves a third party actually inflicting the injury. See *People* v. *Register*, 60 N.Y.2d 270, 277–78, 457 N.E.2d 704, 469 N.Y.S.2d 599 (1983).

This extension of liability is therefore "a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope . . . ." *United States* v. *Lanier*, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997).

## II

I disagree as well with the majority's upholding of multiple sentences for violations of the assault statute and the risk of injury statute that arose out of the defendant's failure to guard the same victim from abuse.

The majority, in sustaining the conviction for risk of injury, finds that the state proved that the defendant acted wilfully, that is, had an intent to cause the victim to be in a situation of risk. See *State* v. *Payne*, 240 Conn. 766, 774, 695 A.2d 525 (1997). The trial court had found the defendant guilty on counts two, three, five, seven, eight and ten of the information, which alleged that the defendant recklessly allowed the victim to be, or failed to prevent the victim from living, "in a situation" where she was at risk of repeated injury and death and thereby caused serious physical injury. In sustaining the defendant's convictions on counts five and ten for assault in the first degree, the majority finds that the defendant recklessly had engaged in conduct that created a risk of death because he failed to guard the victim from repeated abuse and thereby caused the victim subsequently to sustain serious physical injuries. The same conduct, or failure, was the basis of the risk of injury convictions. Given those bases of multiple criminal liability, I would conclude that the defendant may not be punished under the first degree assault statute for having recklessly, and thus unintentionally, failed to act and punished as well under the risk of injury statute for having wilfully, and thus intentionally, failed to act. By no rational theory could the defendant have been found guilty of both crimes.

In *State* v. *King*, 216 Conn. 585, 583 A.2d 896 (1990), the defendant had been convicted of the crimes of both attempted murder and reckless assault in the first degree under § 53a-59 (a) (3). Following such cases as *People* v. *Gallagher*, 69 N.Y.2d 525, 529, 508 N.E.2d 909, 516 N.Y.S.2d 174 (1987), this court reversed those "mutually exclusive and inconsistent" convictions. *State* v. *King*, supra, 593–94, 603. We recognized in *King* that "[r]eckless conduct [as for assault under § 53a-59 (a) (3)] is not intentional conduct [as for attempted murder] because one who acts recklessly does not have

a conscious objective to cause a particular result." (Internal quotation marks omitted.) Id., 594, quoting *State* v. *Beccia*, 199 Conn. 1, 4, 505 A.2d 683 (1986). In the present case the court also would have had to find that the defendant simultaneously acted intentionally as to § 53-21 and recklessly as to § 53a-59 (a) (3) with respect to the victim's situation. We followed *King* in *State* v. *Hinton*, 227 Conn. 301, 630 A.2d 593 (1993), explaining that such mutually exclusive mental states could not exist as to the same act against a single victim. Accordingly, I believe that this court should reverse the defendant's convictions for both of the alternative and mutually exclusive crimes, in accordance with *King* and *Hinton*, and remand the case for a new trial as to all charges where the charges properly would be considered in the alternative.[2] As stated in *King* and reiterated in *Hinton*, we do not have jurisdiction to determine as to which count the defendant should be found guilty. "[I]t is not for this court, on appeal, to make a factual determination as to the defendant's mental state at the time the alleged crime was committed." *State* v. *King*, supra, 595; *State* v. *Hinton*, supra, 321.

The state concedes that the defendant's six assault convictions were based upon two criminal acts, and, accordingly, that the defendant should have been convicted of two rather than six counts of first degree assault. See *State* v. *Miranda*, 56 Conn. App. 298, 301 n.5, 742 A.2d 1276 (2000). The state now requests this court to affirm the convictions with respect to counts five and ten, charging unspecified reckless conduct, and to vacate the convictions with respect to counts

---

[2] Although the defendant briefed the issue of double jeopardy arising from multiple sentences for one offense, he did not bring to our attention the doctrine of *State* v. *King*, supra, 216 Conn. 593–94. However, we have recognized that imposing multiple sentences for mutually exclusive offenses deprives a defendant of his right to have an essential element of the offense, his mental state, be proven. *State* v. *Hinton*, supra, 227 Conn. 313–14. Accordingly, I would apply *King* to this case.

two, three, seven and eight specifying the reckless conduct.

I agree with the state's concession that the defendant may not be punished more than once for the same criminal act of violating a criminal statute. I submit, however, that this defect requires a remand for a new trial as to all six first degree assault counts. It is not the function of this court, an appellate court, to find facts after hearing evidence and determine in what manner and as to which count the defendant violated the first degree assault statute. That function is properly performed in the trial court. In *Dexter Yarn Co.* v. *American Fabrics Co.*, 102 Conn. 529, 538, 129 A. 527 (1925), we quoted *Styles* v. *Tyler*, 64 Conn. 432, 450, 30 A. 165 (1894): " 'Two courts are established and the character of their jurisdiction described by the Constitution itself; one [Superior Court] with a supreme jurisdiction in the trial of causes, and one [Supreme Court] with a supreme and final jurisdiction in determining in the last resort the principles of law involved in the trial of causes.' "

The court in *Dexter Yarn Co.* went on to state: "We further held, as to the Supreme Court, that the jurisdiction of this court as fixed by the Constitution relates to the correction of errors in law and not to the retrial of questions of fact. *Styles* v. *Tyler*, supra [64 Conn. 450]; *Atwater* v. *Morning News Co.*, 67 Conn. 504, 525, 34 Atl. 865 [1896]." *Dexter Yarn Co.* v. *American Fabrics Co.*, supra, 102 Conn. 538. "Our jurisdiction cannot be enlarged, to permit the retrial of facts by us, by legislative enactment or rules of court; *Atwater* v. *Morning News Co.*, supra [525]; *Hoadley* v. *Savings Bank of Danbury*, 71 Conn. 599, 613, 42 Atl. 667 [1899]; and obviously not by the consent or acquiescence of the parties." *Dexter Yarn Co.* v. *American Fabrics Co.*, supra, 538.

In *State* v. *Wilson*, 199 Conn. 417, 438, 513 A.2d 620 (1986), we simply stated: "This court has no constitu-

tional jurisdiction to decide disputed issues of fact," and we have applied this principle in refusing to decide the counts of an information as to which a defendant should be found guilty. See *State* v. *Hinton,* supra, 227 Conn. 321; *State* v. *King,* supra, 216 Conn. 595.

In counts two, three, seven and eight the state specified the reckless conduct it was charging in order to give the defendant the notice of the nature of the charges against him required under the sixth amendment of the United States constitution. It would be pointless to give such notice without also informing the defendant of the specification on which he was convicted.

The defendant was a live-in boyfriend in his girlfriend's apartment. Because the defendant had undertaken "unofficially" a caretaker role in his "familial relationship" with his girlfriend and her children, he owed a duty of care to the victim. The fact remains, however, that the defendant had no right to take the infant victim away from her mother or to direct the child's upbringing or circumstances. All he could do was call an ambulance, which would put the authorities on notice. Because he failed to do this earlier, he was sentenced to forty years, while the girlfriend serves seven years for beating the infant victim.

In sentencing the defendant, the trial court imposed consecutive sentences on counts two, seven and twenty-six, with concurrent sentences on counts three and five as to count two, and on counts eight and ten as to count seven. I agree with the majority in rejecting the state's request that the sentences imposed under counts five and ten remain. However, I would remand the six assault counts and the risk of injury count for a new trial where a finding could be properly made as to issues in those counts.

I therefore respectfully dissent.